USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/27/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
MARK SULLIVAN,                                                  :
                                                                :
                              Plaintiff,                        :
                                                                :   1:23-cv-5194-GHW
            -against-                                           :
                                                                :   MEMORANDUM OPINION &
PETER GELB, MARCIA SELLS,                                       :   ORDER
STEPHANIE BASTA, *and* SAMUEL                                   :
WHEELER,                                                        :
                                                                :
                              Defendants.                       :
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

Defendants removed this case from the Supreme Court of New York, County of New York, asserting that section 301 of the Labor Management Relations Act of 1947 ("LMRA") preempts Plaintiff's state-law claims. *See* Dkt. No. 1. Plaintiff moved to remand the case, arguing that section 301 is not implicated by his complaint. Dkt. Nos. 37, 38. On a motion to remand, Defendants bear the burden of proving that removal was proper. For the reasons that follow, the Court finds that Defendants have met their burden here. Plaintiff's motion to remand is therefore DENIED.

I.    BACKGROUND

    A.  Facts

Plaintiff Mark Sullivan was a member of the "regular chorus" at the Metropolitan Opera (the "Met") from July 21, 2014 through July 31, 2022, having earned tenured status on August 1, 2016. *See* Dkt. No. 1-1 ("Compl.") ¶¶ 13, 14. On August 13, 2021, Mr. Sullivan and the Met entered into a written individual employment contract, the Standard Chorister's Contract, covering the 2021–22 season. *Id.* ¶ 15; Dkt. No. 1-2 at 18 (the "Standard Chorister's Contract," or "SCC"[1]). The Standard

---
[1] This document is marked "Exhibit A" in the complaint. *See* Compl. ¶ 15; Dkt. No. 1-2 at 18.

Chorister's Contract covers the period encompassing August 8, 2021 through January 29, 2022 and February 6, 2022 through June 11, 2022. Dkt. No. 1-2 at 18. It states that Plaintiff "is a member of AGMA," the American Guild of Musical Artists ("AGMA"), and that the SCC "is subject to and includes all the terms and conditions of Sections One and Three of the Collective Bargaining Agreement between [t]he Met and AGMA." *Id.*; *see also* Compl. ¶ 16; Dkt. Nos. 1-2 at 20–46, 1-3 at 1–25, 1-4 at 1–2 (the "CBA"[2]); Dkt. No. 1-2 at 22 (incorporating the SCC into the CBA). The SCC further provides that "[a]ny dispute as to the interpretation, application, or alleged violation or breach of this contract shall be determined in accordance with the procedures governing disputes contained in said collective bargaining agreement." Dkt. No. 1-2 at 18. The SCC states that it "shall be governed by and construed in accordance with the laws of the State of New York, and shall not be modified or discharged except in writing executed by [t]he Met and Chorister and only as long as the terms of the modification are not less favorable to Chorister than as provided in the collective bargaining agreement between [t]he Met and AGMA." *Id.*

The CBA, in turn, governs the terms and conditions of employment between the Met and AGMA members, including the Met's choristers. *See* Dkt. No. 1-2 at 20. It was executed by Peter Gelb, the Met's General Manager, and Leonard Egert, AGMA's Executive Director in November 2020. *Id.* at 37. It provides that artists' contracts with the Met must abide by the terms and conditions set forth in the CBA, noting, for example, that "[a]ny agreement . . . relating to the employment of any ARTIST by the Met shall be null and void and of no effect unless it is executed by ARTIST and the Met in a STANDARD FORM CONTRACT, provided, however, that any written agreement between the Met and any PRINCIPAL shall be binding" if a set of conditions are

---

[2] This is marked "Exhibit B" in the complaint. *See* Compl. ¶ 16; Dkt. No. 1-2 at 20. The CBA spans Dkt. Nos. 1-2 at 20–46, 1-3 at 1–25 (continuing directly from Dkt. No. 1-2 at 46), 1-4 at 1–2 (apparent amendments to the CBA, labeled on the native documentation as Exhibits "A" and "D").

2

met.  *See* Dkt. No. 1-2 at 22.  The CBA sets forth grievance procedures, *id.* at 30–31,[3] and it provides that the CBA "[s]hall not be modified except in a writing executed by the duly authorized representatives of both parties hereto," that is to say, the Met and AGMA, *id.* at 36.  The CBA states that "no changes to the Pension, Health, and Work Rule provisions" of the CBA may be made "subject to any mutually agreed-upon changes pursuant to the procedures provided herein." *Id.*  And it contains an incorporation clause stating that "[e]xecution of this AGREEMENT by both parties shall serve to validate the entirety of this AGREEMENT including this SECTION and all subsequent SECTIONS hereof, exhibits annexed thereto, and AGMA STANDARD FORMS OF EMPLOYMENT CONTRACT" as referenced in Section One of the CBA.  *Id.* at 37.  Further, the "Choristers" section of the CBA, Section Three, provides for choristers' compensation and rehearsal conditions, *id.* at 38, as well as spelling out the "discontinuance" procedures for choristers, *see* Dkt. No. 1-3 at 16.  It provides that, generally speaking, choristers' employment with the Met may be "discontinu[ed]" for cause or for vocal deterioration, provided that a given set of procedures are followed.  *Id.* at 16–17; *see also* Compl. ¶ 29; Dkt. No. 1-2 (the "Sullivan Affidavit") ¶ 55; Dkt. No. 1-6 at 34.

The complaint alleges that the CBA "is subject to changes" from the "Term Sheet," ratified by the Met and AGMA on June 8, 2021.  Compl. ¶ 17; Dkt. No. 1-4 at 3–6 (the "Term Sheet"); Dkt. No. 1-4 at 7 (noting that "[t]he AGMA Board of Governors has ratified a new collective bargaining agreement with the Met[]"); Dkt. No. 41-1.[4]  This "agreement was approved by union leadership

---

[3] An additional grievance and arbitration agreement appears at Dkt. No. 1-3 at 22–25.
[4] Plaintiff's complaint styled the Term Sheet as "Exhibit C" to the complaint.  *See* Dkt. No. 1-1 at 3.  The contents of that exhibit consist of an email from AGMA to, presumably, its members concerning the negotiations surrounding the revised CBA, as well as a document labeled "AGMA Response to Met Proposal—5/11/21," which the Court understands to be the "Term Sheet" as alleged by Plaintiff.  *See* Dkt. No. 1-4 at 3–6; *id.* at 7–8 (describing the agreement via an email from AGMA); *see also* Declaration of Howard Z. Robbins in Support of Defendants' Motion to Dismiss, Dkt. No. 41-1 (providing the same "Term Sheet" document, as well as the "April 30 Tentative Agreements" of the "2021 Negotiations").  Defendants refer to this document—what Plaintiff appears to call the "Term Sheet"—as the "May 11 Agreement," describing this as AGMA and the Met's "latest renewal of the CBA (for the term August 1, 2021-July 31, 2025) . . . ."  Dkt. No. 55, at 3 (native pagination) (citing Dkt. No. 1-4 at 3–6; Dkt. No. 41-1).

3

after a tentative agreement was reached May 11 and following a shop vote of all work groups of AGMA Artists at the Met," including choristers.  Dkt. No. 1-4 at 7.  The Term Sheet provides that the "parties," presumably AGMA and the Met, "agree to meet to discuss the return-to-work safety protocols including the Met's mandatory vaccination proposal within thirty (30) days of the execution of this Agreement, and as necessary depending on changing public health."  Dkt. No. 1-4 at 6.  Plaintiff's complaint refers to the Standard Chorister's Contract, the CBA, and the Term Sheet collectively as the "Agreement" between Plaintiff and Defendants.  Compl. ¶ 18.

On June 18, 2021, the Met and AGMA agreed on "The Metropolitan Opera Mandatory COVID-19 Vaccination Policy" (the "COVID Policy"), which Plaintiff received via email on June 24, 2021, along with a "COVID-19 Reopening Safety Plan – All Employees" (the "Reopening Plan").  *Id.* ¶¶ 19, 20; Dkt. No. 1-4 at 9–14.[5]  The COVID Policy states that by August 1, 2021, "[e]xcept as set forth . . . in the section titled 'Exemptions,' all employees must:  (1) be fully vaccinated against COVID-19 . . . , and (2) provide the Human Resources Department with proof of vaccination."  Dkt. No. 1-4 at 10; *see also* Compl. ¶ 69 (describing the vaccine as "mandatory" under the policy); Sullivan Affidavit ¶¶ 7, 56 (same).  Potentially exempt employees are defined as those unable to "receive a COVID-19 vaccination because of a qualifying disability or sincerely-held religious belief."  Dkt. No. 1-4 at 10.  Under the policy, exempt employees "may be required to undergo COVID-19 testing."  Dkt. No. 1-4 at 10.  The policy further states that "[e]mployees who are not in compliance with this policy may be subject to disciplinary action, up to and including termination of employment, in accordance with the Met's policy;" but "[a]n employee who has timely requested and has been granted an exemption . . . shall not be considered in violation of this

---

[5] Plaintiff's complaint marks both COVID-19 policies as "Exhibit D."  Compl. ¶ 19.  "Exhibit D" includes (1) an email dated June 24, 2021, apparently sent by Ms. Marcia Sells and addressed to all Met employees, distributing "the most updated version of the Met Opera Vaccination Policy," Dkt. No. 1-4 at 9; (2) the COVID Policy itself, *id.* at 10–11; and (3) the Reopening Plan, *id.* at 12–14.

4

policy." *Id.*; *see also* Compl. ¶ 34 (asserting Plaintiff's understanding that "non-compliance with" these policies "would result in disciplinary action and/or possible termination of employment").

The Reopening Plan, dated June 23, 2021, "describes the safety policies and procedures required as a result of the coronavirus pandemic . . . ." Dkt. No. 1-4 at 12. It reaffirms the COVID Policy, noting that employees "without a valid religious or medical exemption [to the vaccination requirement] will [not] be allowed to enter the building without providing proof that they are fully vaccinated." *Id.* According to the Reopening Plan, exempt employees "will be required to wear an appropriate face covering at all times, except when eating or drinking;" and "[w]hen exempt employees are not able to perform their regular work activities while wearing a face covering . . . , they must provide proof of weekly negative PCR tests and remain separated from others by at least 12 feet when performing such activities." *Id.* The Reopening Plan delineates further procedures regarding health screening, sick employees, visitors and contractors, hygiene and cleaning, ventilation, and compliance with the New York HERO Act, *inter alia*. *See id.* at 12–14.

In his complaint, Plaintiff asserts that "neither the [COVID Policy] nor the additional mandatory policies [the Reopening Plan] [were] included in [Plaintiff's] contract, CBA, or Term Sheet." Compl. ¶ 23. Because Plaintiff believed that the COVID Policy "was agreed to by [representatives] of the Met and AGMA . . . outside and apart from contractual negotiations" at the June 18, 2021 meeting, *id.* ¶¶ 20, 43–44, Plaintiff asserts that the COVID Policy and Reopening Plan were "extra-contractual," *id.* ¶¶ 21–22, 34. He further asserts that Samuel Wheeler, in his capacity as "Eastern Counsel of AGMA," "acted in bad faith and breached his duty of fair representation to [Plaintiff] by agreeing, with [Met representatives, to the extra-contractual [COVID Policy]" at the June 18, 2021 meeting. *Id.* ¶¶ 43–45, 76–77. He claims that he "was not noticed of [Mr. W]heeler's agreement to [the COVID Policy]," *id.* ¶ 46, and that "neither [Mr. W]heeler, nor any representative of AGMA, notified all union members that [Mr. Wheeler] supported and approved of the extra-

5

contractual [COVID Policy]," *id.* ¶ 112.  For these reasons, Plaintiff claims that Defendants, in his view, "act[ed] outside the scope of their authority in enforcing" the COVID-19-related policies.  *Id.* ¶ 35.

On June 28, 2021, Plaintiff then "declined offer of [the COVID Policy], mandatory masks, and mandatory testing and requested an accommodation . . . ."  *Id.* ¶ 24; *see also* Sullivan Affidavit ¶ 8.[6]  On July 30, 2021, Marcia Sells responded to Plaintiff's accommodation request by noting that the Met is "unable to allow [Plaintiff] to work on the Met's premises because of the risk that being unvaccinated poses to others," such that "the only accommodation [the Met] can offer is to place [Plaintiff] on an unpaid leave of absence."  Dkt. No. 1-4 at 17 (Ms. Sells's email, styled as "Exhibit F" in the Complaint); *see also* Compl. ¶¶ 25, 37, 90; Sullivan Affidavit ¶ 9.  This leave ultimately became effective August 1, 2021.  Compl. ¶¶ 25, 90; Sullivan Affidavit ¶ 11.

Plaintiff emailed Ms. Sells on August 4, 2021 and August 13, 2021, notifying her that in Plaintiff's view, "her actions, and . . . statement[s] may be in violation of law," Compl. ¶ 91, and asking for further information regarding the "safety, efficacy, and legality" of the COVID Policy, Sullivan Affidavit ¶ 12.  *See also* Dkt. No. 1-4 at 18 (Plaintiff's August 4, 2021 email, styled as "Exhibit G" in the Complaint); Dkt. No. 1-4 at 27 (Plaintiff's August 13, 2021 email, styled as "Exhibit L" in the Complaint); Compl. ¶ 58 (describing P's "repeated[] notice[s]" to Defendants that the COVID Policy and Reopening Plan "would cause [Plaintiff] harm and are dangerous to his body and privacy"); *id.* ¶ 70 (similar).  Ms. Sells emailed Plaintiff on August 12, 2021, explaining the bases for the Met's COVID Policy, Sullivan Affidavit ¶¶ 18–19, and again on September 11, 2021, noting that the Met "reserves the right to terminate [Plaintiff's] employment if [he] do[es] not present proof of vaccination at such time that [his] unpaid leave becomes inconsistent with the Met's operational

---

[6] In an undated email, styled as "Exhibit J" in the Complaint, Plaintiff asserted that he "never applied for a religious exemption;" rather, he "declined the offer of the Met's policy entirely."  Dkt. No. 1-4 at 25.

6

needs," *id.* ¶ 28 (internal quotation marks omitted) (quoting Dkt. No. 1-4 at 32, Ms. Sells's September 11, 2021 email, styled as "Exhibit N" in the Complaint).  On September 14, 2021, Plaintiff filed complaints with the Occupational Safety and Health Administration, as well as with state and local agencies, Compl. ¶ 92, of which he notified Defendants, *id.* ¶ 94; Dkt. No. 1-4 at 38.  On December 15, 2021, Mr. Gelb informed Plaintiff that "entry [to worksite] will not be allowed until the booster has been received."  Compl. ¶ 104 (brackets in original).

On June 6, 2022, Stephanie Basta informed Mr. Sullivan that if the Met "do[es] not receive proof of vaccination [from him] . . . by June 22, [his] employment with the Met will be terminated effective July 31, 2022."  *Id.* ¶ 108 (quoting Dkt. No. 1-6 at 2, Ms. Basta's June 6, 2022 email, styled as "Exhibit V" in the Complaint); Sullivan Affidavit ¶ 39.  Following a series of questions posed by Mr. Sullivan, Ms. Basta again indicated that "[i]f [Mr. Sullivan] do[es] not comply with the [COVID P]olicy, . . . the Met will terminate [his] employment with the Met."  Sullivan Affidavit ¶¶ 40–41 (quoting Dkt. No. 1-6 at 11, Ms. Basta's June 16, 2022 email, styled as "Exhibit X" in the Complaint).  Plaintiff sent what he describes as "[n]otice[s] to seek remedy" to Mr. Gelb, Ms. Sells, and Ms. Basta first on June 21, 2022 and again on July 5, 2022.  Compl. ¶¶ 26, 27; Sullivan Affidavit ¶¶ 42–47.  After failing to provide proof of vaccination, Plaintiff's employment with the Met was terminated on July 31, 2022.  *See* Compl. ¶ 108; Sullivan Affidavit ¶ 48.

Plaintiff was then notified by Annie Hollister, the "Eastern Counsel for AGMA," via email on September 27, 2022 that "[b]ecause [Plaintiff's] termination hinges on a violation of a work rule agreed to between the Met and AGMA, [AGMA's] leverage with respect to a grievance is relatively low."  Sullivan Affidavit ¶ 53 (quoting Dkt. No. 1-6 at 31, Ms. Hollister's September 27, 2022 email, styled as "Exhibit GG" in the Complaint); *see also* Compl. ¶ 52 (asserting that Mr. Wheeler "maintain[ed] that [Plaintiff] was terminated by the Met for just cause for violating a[] . . . 'safety-related work rule'").  This email additionally asserts that Ms. Hollister "was able to confirm that

AGMA and the Met agreed to a mandatory vaccination policy in a meeting on June 18, 2021, and that this policy is reflected in the vaccination protocol document that Marcia Sells distributed on June 25," that is to say, the COVID Policy. Dkt. No. 1-6 at 31. Plaintiff then initiated the CBA grievance process on November 1, 2022. Sullivan Affidavit ¶ 50. Plaintiff maintains that, presumably throughout this process, Mr. Wheeler "refus[ed] to answer" Plaintiff's questions, Compl. ¶ 79, and he "refus[ed] to negotiate" on Plaintiff's behalf in arbitration, *id.* ¶¶ 80, 113. The decision to terminate Plaintiff's employment was upheld by the grievance process. Dkt. No. 1-6 at 14.

### B. Procedural History

On May 17, 2023, Mr. Sullivan commenced this action against Defendants in the Supreme Court of New York, County of New York. *See* Compl. Mr. Sullivan brought claims against Mr. Gelb, the Met's General Manager, *id.* ¶ 5; Ms. Sells, the Met's Chief Diversity Officer, *id.* ¶ 6; Ms. Basta, the Met's General Counsel and Assistant General Manager, *id.* ¶ 7; and Mr. Wheeler, the National Executive Director of Plaintiff's labor union, AGMA, *id.* ¶ 8. AGMA is the collective bargaining representative for members of the Met's Regular Chorus. *See* Dkt. No. 1-2 at 20.

Plaintiff brought claims against Defendants for (1) tortious interference with contractual relations, Compl. ¶¶ 30–61; (2) breach of implied covenant of good faith and fair dealing, *id.* ¶¶ 62–86; (3) retaliation under N.Y. Lab. Law § 740, *id.* ¶¶ 87–100; and (4) "concert of action," *id.* ¶¶ 101–25, by which the Court assumes that Plaintiff is referring to a "concerted-action" liability claim under New York law, *see, e.g.*, *Pittman by Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998) (stating the elements of concerted-action liability claims under New York law). Plaintiff further alleges violations of the New York City Health Code §§ 11.03, 11.05, 11.17, 11.23 and the "[u]nauthorized [p]ractice (of medicine) a [c]rime," presumably referring to N.Y. Educ. Law § 6512. Compl. ¶¶ 40, 41, 93. In addition, Plaintiff asserts a claim against Mr. Wheeler for "breach[] [of] his duty of fair representation." *Id.* ¶¶ 45, 77. Plaintiff seeks damages for lost wages, "or reinstatement of

8

employment," as well as "court fees," and other relief "as the [C]ourt may deem reasonable and just." *Id.* ¶¶ 60–61, 85–86, 99–100, 124–25.

On June 20, 2023, Defendants removed this action from the Supreme Court of New York, County of New York, to this Court. Dkt. No. 1. On August 11, 2023, Plaintiff moved to remand this case back to the Supreme Court of New York, County of New York, Dkt. No. 37, with a supporting memorandum of law, Dkt. No. 38, and declaration, Dkt. No. 39. On September 1, 2023, Defendants filed their oppositions to Plaintiff's motion to remand. Dkt. Nos. 54 ("Mr. Wheeler's Opposition"), 55 (the "Met Defendants'[7] Opposition"). On September 22, 2023, Plaintiff filed his reply to Defendants' opposition briefs. Dkt. Nos. 66 (the "Reply to the Met Defendants"), 68 (the "Reply to Mr. Wheeler").

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 1441(a), defendants may remove to federal court an action originally filed in state court if it could have been brought in federal court:

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a). Defendants assert federal-question jurisdiction as the basis for removal. 18 U.S.C. § 1331; Dkt. No. 1 at 2–4. "On a motion to remand, the party seeking to sustain the removal, not the party seeking remand, bears the burden of demonstrating that removal was proper." *Wilds v. United Parcel Serv., Inc.*, 262 F. Supp. 2d 163, 171 (S.D.N.Y. 2003) (internal quotation marks and citations omitted). Specifically, Defendants must "establish[] to a 'reasonable probability' that removal [was] proper.'" *Anwar v. Fairfield Greenwich Ltd.*, 676 F. Supp. 2d 285, 292

---

[7] The "Met Defendants" refer to Mr. Gelb, Ms. Basta, and Ms. Sells.

9

(S.D.N.Y. 2009) (quoting *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 58 (2d Cir. 2006)). "Unless that burden is met, the case must be remanded back to state court. At this stage therefore, the party seeking remand is presumed to be entitled to it unless the removing party can demonstrate otherwise." *Wilds*, 262 F. Supp. at 171 (quoting *Bellido–Sullivan v. American International Group, Inc.*, 123 F. Supp. 2d 161, 163 (S.D.N.Y. 2000)). "Any doubts regarding the propriety of removal are resolved in favor of remand, and 'federal courts construe the removal statute narrowly.'" *Anwar*, 676 F. Supp. 2d at 292 (quoting *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994)). "When the removal of an action to federal court is challenged, 'the burden falls squarely upon the removing party to establish its right to a federal forum by competent proof.'" *Rosario v. Target Corp.*, 15-cv-3724-KBF, 2015 WL 4597428, at *2 (S.D.N.Y. July 30, 2015) (quoting *R.G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651, 655 (2d Cir. 1979), *abrogated on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77 (2010)).

Further, "[u]nder 28 U.S.C. § 1441(a), a defendant removing a civil action to federal district court 'bears the burden of demonstrating the propriety of removal,' which is determined by the pleadings at the time of removal." *Jean-Louis v. Carrington Mortg. Servs., LLC*, 849 F. App'x 296, 298 (2d Cir. 2021) (summary order) (quoting *Grimo v. Blue Cross/Blue Shield of Vermont*, 34 F.3d 148, 151 (2d Cir. 1994)). The complaint that should be "considered in determining the right to remove . . . [should] be determined according to the plaintiffs' pleading at the time of the petition for removal." *Pullman Co. v. Jenkins*, 305 U.S. 534, 537 (1939) (citations omitted). Courts "generally evaluate a defendant's right to remove a case to federal court at the time the removal notice is filed." *Vera*, 335 F.3d at 116, n.2 (citing *Pullman Co.*, 305 U.S. at 537).

"The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482

10

U.S. 386, 392 (1987) (citing *Gully v. First National Bank*, 299 U.S. 109, 112–13 (1936)). "The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Id.* "A case may not be removed to federal court on the basis of a defense of federal preemption, even if the defense is anticipated in the complaint, and even if the preemption is the only issue in the case." *Foy v. Pratt & Whitney Grp.*, 127 F.3d 229, 232 (2d Cir. 1997) (citing *Caterpillar Inc.*, 482 U.S. at 392).

"Occasionally, however, 'the pre-emptive force of a statute is so extraordinary' that any claim based on preempted state law is considered a federal claim arising under federal law." *Id.* (quoting *Caterpillar Inc.*, 482 U.S. at 393). "This 'complete pre-emption corollary to the well-pleaded complaint rule' applies to claims under § 301 of the LMRA." *Id.* "Accordingly, if the state claims put forward by plaintiffs are preempted by § 301 of the LMRA, 'the action may properly be removed to the federal courts, even when the plaintiff's complaint does not itself include a federal cause of action.'" *Id.* (quoting *Shafii v. British Airways, PLC*, 83 F.3d 566, 569 (2d Cir. 1996) (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994)).

Section 301 of the LMRA states:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties . . . .

29 U.S.C. § 185(a). Therefore, any suit in state court "alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985) (describing the Court's holding in *Loc. 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 102 (1962)). "A state rule that purports to define the meaning or scope of a term in a contract suit therefore is pre-empted by federal labor law." *Id.* Moreover, "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must

11

be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Id.* at 211. "Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract." *Id.*

When "resolution of the state-law claim does not require construing the collective-bargaining agreement," section 301 does not preempt state law. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988). It is only when the state-law claim is "founded directly on rights created by collective-bargaining agreements," *Caterpillar Inc.*, 482 U.S. at 394, or "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract" that the state-law claim is preempted by § 301, *Allis-Chalmers Corp.*, 471 U.S. at 220. A state-law claim would not "be preempted if its application required mere referral to the CBA for 'information such as rate of pay and other economic benefits that might be helpful in determining the damages.'" *Vera v. Saks & Co.*, 335 F.3d 109, 115 (2d Cir. 2003) (quoting *Lingle*, 486 U.S. at 413 n.12).

Here, Plaintiff's complaint was filed on or about May 17, 2023. Dkt. No. 1. Defendants moved to remove on June 20, 2023. *Id.* Following a motion to dismiss, filed August 11, 2023, Dkt. No. 40, Plaintiff amended his complaint on September 1, 2023, Dkt. No. 56. On October 17, 2023, Plaintiff moved "to correct the record" and amend his amended complaint. Dkt. No. 80. Because the pleadings at the time of removal consisted of Plaintiff's original complaint, his May 17, 2023 complaint is considered by the Court in evaluating this motion to remand. *See Pullman Co.*, 305 U.S. at 537; *Jean-Louis*, 849 F. App'x at 298 (summary order); *Vera*, 335 F.3d at 116, n.2.

### B. Removal Was Proper Under 28 U.S.C. §§ 1331 and 1441

#### 1. Federal-Question Jurisdiction

Construing Mr. Sullivan's complaint "to raise the strongest arguments that [it] suggest[s]," *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994)—and indeed, taking its language on its face—the complaint raises a federal claim: breach of the duty of fair representation, Compl. ¶¶ 45, 77.[8] Mr. Sullivan alleged that Mr. "[W]heeler acted in bad faith and breached his duty of fair representation to [Plaintiff] by agreeing, with [Met representatives], to the extra-contractual [COVID Policy at the June 18, 2021] meeting . . . ." *Id.* ¶ 45; *see also id.* ¶ 77 ("[W]heeler, acting as Eastern Counsel of AGMA, breached his duty of fair representation to [Plaintiff] by agreeing, with [Met representatives], to the extra-contractual [COVID Policy] . . . ."). And Plaintiff's detailed allegations in support of this claim are consistent with an effort to plead the elements required for a claim of breach of the duty of fair representation.[9]

---

[8] Because Mr. Sullivan is proceeding pro se, the Court must construe his submissions "liberally" and interpret them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)); *see also, e.g.*, *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (similar). Courts must afford pro se plaintiffs "special solicitude." *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994).

[9] To prove his claim against Mr. Wheeler for breach of the duty of fair representation, Mr. Sullivan must allege, first, that the conduct of Mr. Wheeler, as AGMA's representative, "is arbitrary, discriminatory, or in bad faith." *White*, 237 F.3d at 179 (quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998)) (internal quotation marks omitted). "Second, if [Mr. Sullivan] establish[es] the first element of a [duty of fair representation] claim, [he] must then also prove that there was 'a causal connection between the union's wrongful conduct and their injuries.'" *Id.* (quoting *Spellacy v. Airline Pilots Ass'n–Int'l*, 156 F.3d 120, 126 (2d Cir.1998). This requires Mr. Sullivan to prove that Mr. Wheeler's conduct regarding the negotiation, enactment, or implementation of the COVID Policy and Reopening Plan was arbitrary, discriminatory, or in bad faith; and that Mr. Wheeler's allegedly wrongful conduct in this regard was causally connected to Mr. Sullivan's alleged injuries. *See id.*

Here, in support of his breach of duty of fair representation claim, Mr. Sullivan alleged, *inter alia*, that (1) Mr. Wheeler and Met Defendant Mr. Gelb "actively negotiate[d] the terms of" the SCC, the CBA, and the Term Sheet, Compl. ¶ 33; (2) Mr. Wheeler agreed to the COVID Policy at the June 18, 2021 meeting with Met representatives, *id.* ¶¶ 43, 44; (3) Mr. Wheeler "acted in bad faith and breached his duty of fair representation to [Plaintiff] by agreeing, with [Met representatives], to the extra-contractual [COVID Policy] at said meeting," *id.* ¶ 45; (4) Mr. Wheeler did not provide notice to Mr. Sullivan of Mr. Wheeler's agreement to the COVID Policy, which Mr. Sullivan appears to believe conflicts with the SCC, CBA, and Term Sheet, *id.* ¶¶ 46–48; (5) Mr. Wheeler "refuse[d] to answer" Mr. Sullivan's questions, and "willful[ly]," in Mr. Sullivan's view, "refus[ed] to negotiate, in arbitration, [Mr. Sullivan's] claims," *id.* ¶¶ 49–50, 53; (6) Mr. Wheeler is involved in the enforcement of the COVID Policy and Reopening Plan, which in effect "render[s] [Mr. Sullivan's] performance of [the SCC, CBA, and Term Sheet] impossible," *id.* ¶¶ 51, 54; and (7) Mr. Wheeler allegedly did so "in bad faith," *id.* ¶ 54. These allegations are consistent with an effort to plead a claim for breach of the duty of fair representation.

13

In his memorandum of law, Plaintiff asserts that his "causes of action are brought solely under New York State tort law, New York City Health Code, New York State Education Law, and New York State Labor law." Dkt. No. 38 at 2 (native pagination). But the fact that the duty of fair representation claim does not appear as an enumerated "cause of action" does not mean that it is not a claim pleaded by Plaintiff's complaint at the time of removal. A pro se plaintiff's complaint is not limited to "the legal claims set out in his pleadings," nor is Plaintiff required to enumerate each claim as a "cause of action." *See Phillips v. Girdich*, 408 F.3d 124, 129–30 (2d Cir. 2005). Rather, as the Second Circuit has stated:

> "The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim." Rather, "[f]actual allegations alone are what matters." That principle carries particular force where a pro se litigant is involved. Accordingly, because [Plaintiff's] factual allegations suggested claims under [two discrete laws], the district court was required to construe her complaint as asserting claims under those laws, even if she failed to check the appropriate blank [on a form complaint].

*McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 158 (2d Cir. 2017) (quoting *Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (*en banc*)); *see also Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 344 (S.D.N.Y. 2014) ("In evaluating a pro se complaint, a court is not limited to the causes of action specified by the plaintiff, but instead 'must construe it liberally, applying less stringent standards than when a plaintiff is represented by counsel,' and must construe it to raise the strongest claims it suggests.") (citations omitted); *DiPetto v. U.S. Postal Serv.*, 383 F. App'x 102, 103 (2d Cir. 2010) ("[W]hile pro se complaints must contain sufficient factual allegations to meet the plausibility standard, [courts] should look for such allegations by reading pro se complaints with 'special solicitude' and interpreting them to raise the 'strongest [claims] that they suggest.'") (citations omitted).

Mr. Sullivan's complaint, based on the facts alleged and its plain language, clearly raises a duty of fair representation claim, notwithstanding any of Plaintiff's later assertions to the contrary. *See Pullman Co.*, 305 U.S. at 537 (stating that "in determining the right to remove," courts must

14

consider "the plaintiffs' pleading at the time of the petition for removal"); *Caterpillar Inc.*, 482 U.S. at 392 ("[F]ederal jurisdiction exists only when a federal question is presented *on the face* of the plaintiff's properly pleaded complaint") (emphasis added); *cf. Moskovits v. Grigsby*, No. 19-CV-3991 (VSB), 2020 WL 3057754, at *3 (S.D.N.Y. June 9, 2020) (stating that "on a motion to remand to state court [the district court judge] must make [his or her] determination based upon the allegations and sufficiency of the pleading in the state court complaint," notwithstanding subsequent developments).

A claim for breach of the duty of fair representation arises under the National Labor Relations Act of 1935 (the "NLRA"), 29 U.S.C. § 151 *et seq.*, as amended in relevant part by section 301 of the Taft-Hartley Act of 1947 (the LMRA), *id.* § 185. *See, e.g., Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 97 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1056 (2023). Section 301 of the LMRA "governs the employer's duty to honor the collective bargaining agreement, and the duty of fair representation is implied under the scheme of the National Labor Relations Act . . . ." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 128 F.3d 110, 113 (2d Cir. 1997) (citing *DelCostello*, 462 U.S. at 164; *Price v. International Union, United Auto. Aerospace & Agric. Implement Workers*, 795 F.2d 1128, 1134 (2d Cir. 1986) (finding that a union's duty of fair representation is implied from section 9(a) of the NLRA, 29 U.S.C. § 159(a)). As the Second Circuit has stated, "[t]he duty of fair representation is a 'statutory obligation' under the NLRA, requiring a union 'to serve the interests of all members without hostility or discrimination . . . , to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 387 (2d Cir. 2015) (quoting *Vaca*, 386 U.S. at 177); *see also Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1075 (2d Cir. 2021) ("The 'duty of fair representation arises from the National Labor Relations Act,' specifically from 'the grant under [29 U.S.C. § 159(a)] of the union's exclusive power to represent all employees in a particular bargaining unit.'") (citations omitted). This claim is animated by the

15

policies of federal labor law. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164, n.14 (1983) ("The duty of fair representation exists because it is the policy of the National Labor Relations Act to allow a single labor organization to represent collectively the interests of all employees within a unit . . . . The duty stands 'as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law.'") (citations omitted); *see also Vaca v. Sipes*, 386 U.S. 171, 177 (1967) (describing the origin of the statutory duty of fair representation and noting that "[i]t is obvious that [a union member's] complaint alleged a breach by the Union of a duty grounded in federal statutes").

Because Mr. Sullivan's claim against Mr. Wheeler for breach of the duty of fair representation arises under federal labor law, it confers federal-question jurisdiction on this Court pursuant to 28 U.S.C. § 1331. *See Waterman v. Transp. Workers' Union Loc. 100*, 8 F. Supp. 2d 363, 369 (S.D.N.Y. 1998) (noting that a "claim against the union for breach of the duty of fair representation arises under federal labor law and is hence a federal question claim within the meaning of 28 U.S.C. § 1331"). The Court, therefore, has original jurisdiction over this action under 28 U.S.C. § 1331, as Mr. Sullivan's complaint raises a federal question—breach of the duty of fair representation, pursuant to section 301 of the LMRA.

### 2. The Removal Statute

In addition to his federal breach of duty of fair representation claim, Compl. ¶¶ 45, 77, Mr. Sullivan brings state- and local-law claims for tortious interference with contractual relations, *id.* ¶¶ 30–61, breach of implied covenant of good faith and fair dealing, *id.* ¶¶ 62–86, retaliation, *id.* ¶¶ 87–100, and concerted-action liability, *id.* ¶¶ 101–25. These claims are properly removed pursuant to the removal statute.

Under the removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the

defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C.A. § 1441(a). Where said civil action includes "(A) a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and (B) a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute, the entire action may be removed if the action would be removable without the inclusion of the claim described in subparagraph (B)." *Id.* § 1441(c). As the United States Supreme Court has stated:

> In 28 U.S.C. § 1441(c), Congress dealt with the situation in which a claim that would be removable if sued upon alone is joined with one or more "separate and independent" claims that are not themselves removable. The section provides that the entire case may be removed and that the district court, in its discretion, may either adjudicate all claims in the suit or remand the independently nonremovable claims.

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 354 (1988); *accord Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 636 (2009) (noting that 28 U.S.C. § 1441(c) "allows removal of an 'entire case' when it includes at least one claim over which the federal district court has original jurisdiction"). Given that the action here would be removable with or without the inclusion of the state- and local-law claims, the entire action has been properly removed to federal court. *See id.*[10]

### III. CONCLUSION

For these reasons, the Court finds that removal was proper pursuant to 28 U.S.C. §§ 1331 and 1441. Therefore, Plaintiff's motion to remand is denied. The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 37, 65, and 67.

SO ORDERED.

Dated: November 27, 2023
New York, New York

                                             GREGORY H. WOODS
                                             United States District Judge

---

[10] The Court takes no position at this time as to whether it has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.