USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/25/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                              :

MARK SULLIVAN,                  :

                              :

                     Plaintiff,   :

                              :                    1:23-cv-5194-GHW

              -against-       :

                              :        MEMORANDUM OPINION &

PETER GELB, MARCIA SELLS,      :              ORDER
STEPHANIE BASTA, *and* SAMUEL    :
WHEELER,                 :

                              :

                    Defendants. :
-----------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

       With the onset of COVID-19, employers around the country introduced masking, testing, and vaccination protocols—including here in New York. The Metropolitan Opera (the "Met") introduced its own policy in the wake of the pandemic, requiring employees to be fully vaccinated against the coronavirus unless they had a qualifying disability or religious exemption. Following negotiations with the American Guild of Musical Artists, the union that represents employees of the Met, the Met promulgated this policy pursuant to its authority under the collective bargaining agreement. The COVID policy set forth clear procedures for compliance and the process by which employees could apply for exemptions from the vaccination requirement. It stated that exempt employees may be required to undergo regular testing for the virus, and that noncompliant employees may be subject to disciplinary action, including termination.

       Rather than complying or securing an exemption, one of the Met's choristers—Mark Sullivan—sent an onslaught of emails to Met representatives, disputing the efficacy of COVID-19 vaccines, masks, and tests. He questioned the Met's authority to "coerce" him into compliance with the policy. He alleged that the Met and the union had colluded to secretly negotiate and enact the

policy, and that his own interests would not be adequately represented through the formal grievance process—particularly when the same union representative that was involved in negotiating the policy, Samuel Wheeler, would potentially represent him in that process.  As a result of his noncompliance and failure to secure an exemption, in the fall of 2021, Mr. Sullivan was placed on an unpaid leave of absence.  The following summer, he was terminated.  After declining to contest his termination through the formal grievance procedure established by the collective bargaining agreement, Mr. Sullivan filed this lawsuit seeking relief.

Because Mr. Sullivan failed to timely file this "hybrid" lawsuit—which alleges breach of the duty of fair representation and violations of section 301 of the Labor Management Relations Act—Plaintiff's claims are dismissed.  Defendants' motions to dismiss are therefore GRANTED.

## I.      BACKGROUND

### A.   Facts

Mark Sullivan began working as a member of the Met's "Regular Chorus" on July 21, 2014.  Dkt. No. 56 (the "FAC") ¶ 13.  He earned tenured status on August 1, 2016.  *Id.* ¶ 14.  Members of the Met's Regular Chorus, including Mr. Sullivan, are represented in collective bargaining by the American Guild of Musical Artists ("AGMA").  *See* Dkt. No. 56-1 at 1–2.

#### 1.   The Underlying Labor Contracts

On August 13, 2021, Mr. Sullivan and the Met entered into a written individual employment contract, the Standard Chorister's Contract, covering the 2021–22 season.  FAC ¶ 15; Dkt. No. 56-1 at 1–2 (the "Standard Chorister's Contract," or "SCC"[1]).  The Standard Chorister's Contract states that Plaintiff is a member of AGMA, and that the SCC "is subject to and includes all the terms and conditions of Sections One and Three of the Collective Bargaining Agreement between [t]he Met

---

[1] This document is marked "Exhibit A" in the FAC.  *See* FAC ¶ 15; Dkt. No. 56-1 at 1.

and AGMA."  *Id.*; *see also* FAC ¶ 16; Dkt. Nos. 56-2 at 1–18 (the "CBA"),[2] 56-2 at 19–48 ("Section

Three"); *see also* Dkt. No. 56-2 at 3 (incorporating the SCC into the CBA).  The SCC states that it

"shall be governed by and construed in accordance with the laws of the State of New York, and

shall not be modified or discharged except in writing executed by [t]he Met and Chorister and only

as long as the terms of the modification are not less favorable to Chorister than as provided in the

collective bargaining agreement between [t]he Met and AGMA."  SCC at 1.  The SCC further

provides that "[a]ny dispute as to the interpretation, application, or alleged violation or breach of

this contract shall be determined in accordance with the procedures governing disputes contained in

said collective bargaining agreement."  *Id.*

The CBA, in turn, governs the terms and conditions of employment between the Met and

AGMA members, including the Met's choristers.  *See* CBA at 1.  It was executed by Peter Gelb, the

Met's General Manager, and Leonard Egert, AGMA's Executive Director, in November 2020.  *Id.* at

18.  It provides that all of the artists' contracts with the Met must conform to the terms and

conditions set forth in the CBA.  *See id.* at 3.  It sets forth specified grievance procedures, *see id.* at

11–12,[3] and establishes that the CBA "[s]hall not be modified except in a writing executed by the

duly authorized representatives of both parties hereto," the Met and AGMA, *id.* at 17.  The CBA

states that "no changes to [its] Pension, Health, and Work Rule provisions" may be made "subject to

any mutually agreed-upon changes pursuant to the procedures provided herein."  *Id.*  And it contains

an incorporation clause.  *Id.* at 18.  Further, the "Choristers" section of the CBA, Section Three,

provides for choristers' compensation and rehearsal conditions, *see id.* at 19–48, and the

"discontinuance" procedures for choristers, *see id.* at 43–44.  It dictates that, generally speaking,

---

[2] The CBA is marked "Exhibit B" in the FAC.  *See* FAC ¶ 16.
[3] An additional "Grievance and Arbitration Agreement" appears at Dkt. No. 56-2 at 49–54.

choristers' employment with the Met may be "discontinu[ed]" for cause or for vocal deterioration. *See id.*; *see also* FAC ¶ 64.

The complaint alleges that the CBA "is subject to changes," such as the "Term Sheet," ratified by the Met and AGMA on June 8, 2021.  FAC ¶ 17; *see also* Dkt. No. 56-3 (the "Term Sheet"); Dkt. No. 56-3 at 5 (noting that "[t]he AGMA Board of Governors has ratified a new collective bargaining agreement with the Met[]"); Dkt. No. 41-1.[4]  This "agreement was approved by union leadership after a tentative agreement was reached May 11 and following a shop vote of all work groups of AGMA Artists at the Met," including choristers.  Dkt. No. 56-3 at 5.  The Term Sheet provides that the "parties," AGMA and the Met, "agree to meet to discuss the return-to-work safety protocols including the Met's mandatory vaccination proposal within thirty (30) days of the execution of this Agreement, and as necessary depending on changing public health."  *See id.* at 4.  Plaintiff's complaint refers to the Standard Chorister's Contract, the CBA, and the Term Sheet collectively as the "Agreement" between Plaintiff and Defendants.  *See* FAC ¶¶ 15–18.

### 2.  The Covid Policies Are Promulgated

On June 18, 2021, the Met and AGMA agreed on "The Metropolitan Opera Mandatory COVID-19 Vaccination Policy" (the "COVID Policy"), which Plaintiff received via email on June 24, 2021, along with a "COVID-19 Reopening Safety Plan – All Employees" (the "Reopening Plan") (together, the "COVID Policies").  *Id.* ¶¶ 25–26; Dkt. No. 56-4.[5]  The COVID Policy states

---

[4] Plaintiff's complaint marked the Term Sheet "Exhibit C" to the complaint.  *See* FAC ¶ 17; Dkt. No. 56-3.  The contents of that exhibit consist of an email from AGMA to its members concerning the negotiations surrounding the revised CBA, as well as a document labeled "AGMA Response to Met Proposal—5/11/21," which the Court understands to be the "Term Sheet" as alleged by Plaintiff.  *See id*; Dkt. No. 56-3 at 5–6 (describing the agreement via an email from AGMA); *see also* Declaration of Howard Z. Robbins in Support of Defendants' Motion to Dismiss, Dkt. No. 41-1 (providing the same "Term Sheet" document, as well as the "April 30 Tentative Agreements" of the "2021 Negotiations").  Defendants refer to this document—what Plaintiff appears to call the "Term Sheet"—as the "May 11 Agreement," describing this as AGMA and the Met's "latest renewal of the CBA (for the term August 1, 2021-July 31, 2025) . . . ."  Dkt. No. 55 at 3 (native pagination) (citing Dkt. No. 1-4 at 3–6; Dkt. No. 41-1).

[5] Plaintiff's complaint marks the COVID-19 Policies "Exhibit D."  FAC ¶ 26.  "Exhibit D" includes (1) an email dated June 24, 2021, sent by Marcia Sells and addressed to all Met employees, distributing "the most updated version of the Met Opera Vaccination Policy," Dkt. No. 56-4 at 1; (2) the COVID Policy, *id.* at 2–3; and (3) the Reopening Plan, *id.* at 4–6.

that by August 1, 2021, all non-exempt employees must "be fully vaccinated against COVID-19"

and "provide the Human Resources Department with proof of vaccination." Dkt. No. 56-4 at 2.

Potentially exempt employees are defined as those unable to "receive a COVID-19 vaccination

because of a qualifying disability or sincerely-held religious belief . . . ." Dkt. No. 56-4 at 2.  Under

the policy, exempt employees "may be required to undergo COVID-19 testing," and noncompliant

employees "may be subject to disciplinary action, up to and including termination of employment, in

accordance with the Met's policy." *Id.*  But "[a]n employee who has timely requested and has been

granted an exemption . . . shall not be considered in violation of this policy." *Id.*; *see also* FAC ¶ 87

(stating Plaintiff's understanding that "non-compliance with [the COVID] Policy . . . would result in

disciplinary action and/or possible termination of employment").

The Reopening Plan, dated June 23, 2021, "describes the safety policies and procedures

required as a result of the coronavirus pandemic when Met employees return to the building." Dkt.

No. 56-4 at 4.  It reaffirms the COVID Policy, noting that employees "without a valid religious or

medical exemption [to the vaccination requirement] will [not] be allowed to enter the building

without providing proof that they are fully vaccinated." *Id.*  According to the Reopening Plan,

exempt employees "will be required to wear an appropriate face covering at all times, except when

eating or drinking;" and "[w]hen exempt employees are not able to perform their regular work

activities while wearing a face covering . . . , they must provide proof of weekly negative PCR tests

and remain separated from others by at least 12 feet when performing such activities." *Id.*; *see also*

FAC ¶ 27 (describing mask and testing requirements as "mandatory" under the COVID Policies).

In his complaint, Plaintiff asserts that "neither the [COVID] Policy nor the additional

mandatory policies" listed in the Reopening Plan "are included in [Plaintiff's] contract, CBA, or

Term Sheet." FAC ¶ 45. But, he asserts, they are "not expressly forbidden by the Agreement" either. *Id.* ¶ 125.[6]

### 3. Mr. Sullivan "Declines" the Policies and is Placed on an Unpaid Leave of Absence

On June 28, 2021, Plaintiff wrote to Marcia Sells to "decline[ the] offer of [the COVID] Policy, mandatory masks, and mandatory testing and request[] an accommodation." *Id.* ¶ 27. On July 30, 2021, Ms. Sells responded that the Met was unable to allow Plaintiff to "work on the Met's premises 'because of the risk that being unvaccinated poses to others.'" *Id.* ¶ 42. Mr. Sullivan argues that Ms. Sells "ma[d]e this statement with the conscious intention to prevent [him] from enjoying the benefits of his contract." *Id.* ¶ 168. In the email, Ms. Sells "also wr[o]te, 'the only accommodation [the Met] can offer is to place [Plaintiff] on an unpaid leave of absence.'" *Id.* ¶ 174. This unpaid leave became effective August 1, 2021. *Id.* ¶ 48.

On August 3, 2021, Mr. Sullivan emailed Ned Hanlon, "a Met chorister and chair of the Met AGMA negotiating committee, with a request to 'please send me any and all language in the new CBA referring to Met/AGMA COVID-19 protocols and agreements.'" *Id.* ¶ 28. Mr. Hanlon responded the next day, carbon-copying Mr. Wheeler on the email and "writing, 'we have not yet finalized our Covid safety language with the Met . . . . [A]s soon as we do[,] we will be able to circulate a document and guidance that is cohesive with the Met's overall Covid safety Policy.'" *Id.* ¶¶ 29, 31. Mr. Sullivan alleges that this "'document and guidance' was [n]ever circulated." *Id.* ¶ 30. Mr. Sullivan then responded, noting that he "cannot sign a contract without first seeing the completed CBA" and again asking for "any COVID-19 policy, procedure or protocol language that is in the CBA." *Id.* ¶ 32. Mr. Hanlon replied: "There is no COVID language in the CBA. However, we are very close to finalizing a separate agreement with COVID protocols." *Id.* ¶ 33.

---

[6] Although the Court must accept as true the facts alleged in the complaint, *see, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147 152 (2d Cir. 2002), this is "inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

Mr. Sullivan alleges that "no such 'separate agreement with COVID protocols' was ever shared with" him.  *Id.* ¶ 34.  He states that the COVID Policy "makes no mention of AGMA, [Mr. W]heeler, or any involvement by any union . . . other than a footnote that states, 'This policy has been sent to all unions representing Met employees.'"  *Id.* ¶ 35 (quoting Dkt. No. 56-4 at 2 n.1).  Consequently, Mr. Sullivan "believe[d] that the [COVID] Policy was issued unilaterally by the Met."  *Id.* ¶ 37; *see also id.* ¶ 378.  He contends that Mr. Wheeler, "in collusion with defendants [G]elb and [S]ells," "present[ed] the policy as coming exclusively from the Met."  *Id.* ¶ 319.  As a result of this understanding, Plaintiff decided "to pursue resolution and remedy solely with . . . the Met."  *Id.* ¶ 379.

The Met began conducting twice-weekly PCR testing and enforcing its mask mandate in August of 2021.  *Id.* ¶¶ 43–44.  Plaintiff wrote to Ms. Sells on August 4, 2021, asking for further information regarding the COVID Policies.  *See id.* ¶ 179.  He emailed her a series of questions about the COVID-19 vaccines, challenging their safety and efficacy, and calling them "experimental."  *See id.* ¶¶ 179–88, 191–92.[7]  He alleges that he "notice[d]" the defendants "that compliance with said policies would permanently alter and potentially cause harm to his bodily property."  *Id.* ¶ 88.

Ms. Sells responded to Mr. Sullivan's queries on August 12, 2021, writing that the COVID Policies were "based on CDC and State of New York guidelines, as well as the best information

---

[7] Mr. Sullivan's complaint lists secondary sources opining on the efficacy of face masks in reducing virus transmission, *id.* ¶¶ 65–66, and on the efficacy of COVID-19 vaccines and the respective risks of transmission of vaccinated and non-vaccinated individuals, *see id.* ¶¶ 67–71, 171–73, 177–78, 249–51, 258, 460–61; *see also id.* ¶¶ 72–78 (alleging various risks of COVID-19 vaccines).  The complaint also asserts that the COVID-19 vaccines "were known to be . . . ineffective at preventing transmission of COVID-19," and that "the unvaccinated posed no greater danger to the safety of others than the vaccinated."  *Id.* ¶¶ 202–03.  Mr. Sullivan personally "fear[ed]" that injection with" the COVID-19 vaccine "would result in an adverse and disabling health condition, or death," particularly given his and his family's history of medical conditions.  *See id.* ¶¶ 462–65.  He considered the vaccine to be "experimental."  *Id.* ¶ 106.

currently being provided by government agencies and medical experts." *Id.* ¶ 195.[8]  She noted that

the vaccines were FDA-approved and "found by medical experts and scientists to be

overwhelmingly safe and effective," such that "the Met does not believe that any further assurance

on the safety and effectiveness of the vaccines in necessary." *Id.* ¶ 196.[9]  Ms. Sells added that

"should [Mr. Sullivan] choose to remain unvaccinated, the only accommodation [the Met] can offer

is to place [him] on an unpaid leave of absence." *Id.* ¶ 197.  Mr. Sullivan alleges that Ms. Sells did

not answer several of his specific questions about the vaccines and associated liabilities.  *See id.*

¶¶ 207–14.  Mr. Sullivan continued to challenge the COVID Policies in emails to Ms. Sells, *see id.*

¶¶ 215–19, stating that unpaid leave is unsatisfactory and that he "would be willing to accept paid

leave, in lieu of being able to return to work," *id.* ¶ 218.

Ms. Sells replied again on September 11, 2021, explaining that Mr. Sullivan is "on unpaid

leave because [he] ha[d] not presented proof of vaccination," and that the Met "reserves the right to

terminate [his] employment if [he] do[es] not present proof of vaccination at such time that [his]

unpaid leave becomes inconsistent with the Met's operational needs." *Id.* ¶¶ 223–24.  In November

2021, Mr. Sullivan began, in his words, "seek[ing] remedy" by sending what he describes as

"notices" to the Mr. Gelb, Ms. Sells, and Ms. Basta (collectively, the "Met Defendants")—including

a "Notice of Claim and Affidavit of Fact," a "Notice of Default/Affidavit of Fact," a "Notice of

Default to Claim," and a "Notice to seek remedy."  *Id.* ¶¶ 232–37.

---

[8] Mr. Gelb additionally sent several emails "to members of the company" touting the benefits of booster vaccinations and masks. *Id.* ¶¶ 254–55, 259, 495–96.  When Mr. Sullivan sent Mr. Gelb questions about these claims, he did not respond. *Id.* ¶ 278.
[9] Mr. Sullivan further alleges that this email "negligently asserted that the vaccines were approved by the FDA when in fact they were still classified as E.U.A. biologic products." *Id.* ¶ 201.  He wrote to Ms. Sells stating that it was "factually untrue" that the vaccine was FDA-approved.  *Id.* ¶ 402.  He contends that Ms. Sells had "deliberately and fraudulently misrepresented" the FDA-approval comment in her previous email. *Id.* ¶ 403.

### 4. Mr. Sullivan is Terminated for Noncompliance

On June 6, 2022, the Met's Assistant General Manager and General Counsel, Stephanie Basta, informed Mr. Sullivan that if the Met "do[es] not receive proof of vaccination [from him] or a request for an exemption by June 22, [his] employment with the Met will be terminated effective July 31, 2022." *Id.* ¶ 419; *see also id.* ¶ 7. Following further questions posed by Mr. Sullivan, which Ms. Basta did not answer, Ms. Basta again indicated that "[i]f [Mr. Sullivan] do[es] not comply with the [COVID P]olicy, . . . the Met will terminate [his] employment with the Met." *See id.* ¶¶ 420–29, 442, 501. Plaintiff again sent what he describes as "[n]otice[s] to seek remedy" to Mr. Gelb, Ms. Sells, and Ms. Basta on June 21, 2022 and on July 5, 2022. *Id.* ¶¶ 61–62, 432–33. Nonetheless, "no accommodation [to the COVID Policies] in line with [the] Agreement was ever provided" to him. *Id.* ¶ 99. Mr. Sullivan argues that he was "induced . . . to not comply with [the COVID] Policy" by the Met Defendants' "deliberate omissions of factual information and refusal to answer [his] specific questions regarding medical liability, insurance liability, vaccine ingredients, and possible health risks" associated with the COVID-19 vaccine. *Id.* ¶ 438. Ultimately, after failing to provide proof of vaccination, Plaintiff's employment with the Met was terminated on July 31, 2022. *See id.* ¶¶ 339, 419. This termination became "effective August 1, 2022." *Id.* ¶ 63.

### 5. The Aftermath

After being terminated, Plaintiff then emailed Annie Hollister, AGMA's Eastern Counsel, about the grievance process. *Id.* ¶ 339. Ms. Hollister emailed him back on September 27, 2022, stating that "[b]ecause [Mr. Sullivan's] termination hinges on a violation of a work rule agreed to between the Met and AGMA, [AGMA's] leverage with respect to a grievance is relatively low." *Id.* ¶ 440; *see also id.* ¶ 101 (asserting that Mr. Wheeler "maintain[ed] that [Mr. Sullivan] was terminated by the Met for just cause for violating a[] . . . 'safety-related work rule'"). Ms. Hollister's email also stated that (1) "AGMA and the Met agreed to a Policy in a meeting on June 18, 2021, and . . . this

policy is reflected in the document that Sells distributed on June 25," *id.* ¶ 335, and (2) "[a]lthough these discussions happened around the same time as the CBA ratification, they were not negotiated as part of the CBA process." *Id.* ¶ 336.

Mr. Sullivan then "discovered on October 5, 2022 . . . that [Mr. W]heeler himself actually agreed . . . to said Policy on June 18, 2021, and all [of Mr. Wheeler's attempts to] find accommodations for union members who did not consent to [the COVID] Policy were . . . false and performative at best." *Id.* ¶ 39; *id.* ¶¶ 337, 374 (similar). Relatedly, Mr. Sullivan alleges that "neither [Mr. W]heeler nor AGMA notified" the union members that they had negotiated and agreed to the COVID Policies at the June 18 meeting. *Id.* ¶¶ 323, 504. Nor did the Met Defendants provide notice of AGMA's involvement. *See id.* ¶ 372; *id.* ¶ 369 (contending that the Met Defendants "fraudulently omitted . . . [Mr. W]heeler's involvement" in negotiating the policy).

Mr. Sullivan "authorize[d] initiation of the grievance process on November 1, 2022." *Id.* ¶ 342. The same day, he sent Ms. Sells a "Notice of Claim and Affidavit of Fact . . . documenting [his prior] correspondences [to her] and requesting evidence of his obligation to" get vaccinated, along with many other "notices." *See id.* ¶¶ 404–09. On November 30, 2022, the Met's attorney, Rebecca Wu, emailed Ms. Hollister, stating that "the decision to terminate Mr. Sullivan's employment is upheld." *Id.* ¶ 343. Plaintiff was notified of this decision on December 6, 2022. *Id.* ¶ 344.

In January 2023, Mr. Sullivan told Mr. Wheeler that he "believe[s] [that COVID] vaccines . . . cause . . . harm," *id.* ¶ 141, and he requested records of the June 18 meeting, *id.* ¶ 143; *see also id.* ¶¶ 346–49. Mr. Wheeler and Ms. Hollister informed Plaintiff that they had no records of this meeting. *Id.* ¶¶ 338, 375. Mr. Sullivan continued, in his words, "seeking remedy" from Mr. Wheeler through late January and early February 2023. *Id.* ¶¶ 145–46. This included emails sent from Mr. Sullivan to Mr. Wheeler asking, *inter alia*, whether it was Mr. Wheeler's "intent to create a conflict of

interest that prevents a fair and unbiased grievance and arbitration process . . . ." *Id.* ¶¶ 349–51.  Mr. Wheeler "did not answer" Mr. Sullivan's questions, and Mr. Sullivan contends that he "purposely and with full knowledge withh[e]ld evidence of his . . . participation" in the COVID Policies' negotiation. *Id.* ¶¶ 147–48, 352.

Mr. Sullivan contends that this constitutes a "conflict of interest," which Mr. Wheeler allegedly "attempt[ed] to hide." *Id.* ¶ 353.  Accordingly, Mr. Sullivan believed that Mr. Wheeler "could not fairly represent [his] claims . . . in arbitration," *id.* ¶ 150, that Mr. Wheeler "deliberate[ly]" refused to pursue Mr. Sullivan's claims, *id.* ¶ 152, and that "utilizing AGMA representation in the arbitration process would have caused harm to" Mr. Sullivan, *id.* ¶ 353.  In this way, Mr. Sullivan asserts that he "determined that his claims would be tainted in arbitration" because Mr. Wheeler's "omission"—that he negotiated the COVID Policies with the Met on behalf of AGMA—"surfaced during the course of [Mr. Sullivan's] grievance process." *Id.* ¶ 345; *accord id.* ¶ 102.

Last, Mr. Sullivan contends that his tenured position was a valuable and unparalleled employment opportunity that "is impossible to replace," and that his "career was permanently and irreparably damaged" as a result of the defendants' conduct.  *See id.* ¶¶ 117–19; *accord id.* ¶¶ 159–63, 239–44, 278–84, 306–13, 355–60, 447–50, 483–88, 518–20.

### B.  Procedural History

On May 17, 2023, Mr. Sullivan commenced this action against Defendants in the Supreme Court of New York, County of New York.  *See* Dkt. No. 1.  On June 20, 2023, Defendants removed this action from the Supreme Court of New York, County of New York, to this Court.  *See id.*  On August 11, 2023, Plaintiff moved to remand this case back to the Supreme Court of New York,

County of New York, Dkt. No. 37, which the Court denied in its November 27, 2023 order, Dkt. No. 100.[10]  Plaintiff filed his first amended complaint on September 1, 2023.

In the FAC, Mr. Sullivan brought claims against Mr. Gelb, the Met's General Manager, *id.* ¶ 5; Ms. Sells, the Met's Chief Diversity Officer, *id.* ¶ 6; Ms. Basta, the Met's General Counsel and Assistant General Manager, *id.* ¶ 7; and Mr. Wheeler, the former Eastern Counsel and current National Executive Director of Plaintiff's labor union, AGMA, *id.* ¶ 8.  In short, he argues that the Met Defendants and Mr. Wheeler "colluded" to secretly develop and enforce the COVID Policies and did so "outside of the scope of their authority," *id.* ¶¶ 315, 330, 365–66, 513; that the defendants intentionally obscured the union's role in these negotiations, *id.* ¶¶ 41–44, 96–97; and that the defendants harmed Mr. Sullivan by "intentionally" and "without consent" "making coercive medical decisions that permanently affect [his] bodily property . . . off the worksite," *id.* ¶¶ 104–05.  He further argues that Defendants "deliberately, and with full knowledge, act[ed] in bad faith by labelling the [COVID Policies] . . . 'safety related work rules,'" *id.* ¶ 126; that they were wrong to deny his request for an accommodation to the COVID Policies, and that by doing so they "prevent[ed] [Mr. Sullivan] from performing [the] duties of [the] Agreement," *id.* ¶ 108.  According to Mr. Sullivan, Defendants wrongly refused his request for paid leave, wrongly "withh[e]ld [his] compensation," and fired him without authority to do so, *id.* ¶¶ 109–10, 112, 176, 517.

Much of Plaintiff's argument centers around the language of Term Sheet:  Mr. Sullivan contends that Mr. Wheeler and the Met Defendants were authorized "only to '*discuss* the return-to-work safety protocols including the Met's mandatory vaccination proposal,'" and not to promulgate the COVID Policies.  *Id.* ¶¶ 324, 371 (quoting the Term Sheet) (emphasis in the FAC).  He additionally claims Mr. Wheeler "had a duty to assess the health risks and financial liabilities of any

---

[10] The Court found that removal was proper pursuant to 28 U.S.C. §§ 1331 and 1441 because Plaintiff pleaded breach of the duty of fair representation—conferring federal-question jurisdiction.  *See generally* Dkt. No. 100.

medical interventions sought to be mandated by the Met on AGMA union members and a duty to seek consent from union members for such a mandate," *id.* ¶ 317; and that Mr. Wheeler "willful[ly] and unlawful[ly] fail[ed] to pursue" his claims "in the grievance process or in arbitration," *id.* ¶ 103.

Plaintiff brought claims against Defendants for (1) tortious interference with contractual relations, by all the defendants, *id.* ¶¶ 81–121; (2) breach of implied covenant of good faith and fair dealing, by Mr. Gelb and Mr. Wheeler, *id.* ¶¶ 122–64; (3) "negligent misrepresentation causing harm," by Ms. Sells, *id.* ¶¶ 165–245, and by Mr. Gelb, *id.* ¶¶ 246–85; (4) negligence by the Met Defendants, *id.* ¶¶ 286–313; (5) fraud by Mr. Wheeler, *id.* ¶¶ 314–61, and by the Met Defendants, *id.* ¶¶ 362–451; (6) assault by the Met Defendants, *id.* ¶¶ 452–89; and (7) "concert of action" by all of the defendants, *id.* ¶¶ 490–522, which the Court construes as a "concerted-action" liability claim under New York law.  Plaintiff also asserts violations of myriad New York state and municipal laws. *See id.* ¶¶ 52–58, 92, 106, 111, 290–91, 296, 301–03, 354, 380, 444–45, 492.  In addition, Plaintiff asserts a claim against Mr. Wheeler for "breach[] [of] his duty of fair representation." *Id.* ¶¶ 95, 138. Plaintiff seeks compensatory and punitive damages, summing to nearly $4,000,000, as well as "such other and further relief as the [C]ourt may deem reasonable and just under the circumstances." *Id.* ¶¶ 164–65, 245, 285, 313, 361, 451, 489, 522.

Defendants moved to dismiss the FAC on October 20, 2023.  *See* Dkt. Nos. 86, 90; Dkt. No. 87 ("Met Defendants' Mem."); Dkt. No. 91 ("Mr. Wheeler's Mem.").  On November 17, 2023, Plaintiff filed his responses.  Dkt. Nos. 98 ("Response to Wheeler"), 99 ("Response to Met Defendants").  On December 1, 2023, Defendants filed their replies.  Dkt. Nos. 102 ("Met Defendants' Reply"), 103 ("Mr. Wheeler's Reply").

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  It is not

enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]"

claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  "To survive

dismissal, the plaintiff must provide the grounds upon which his claim rests through factual

allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v.*

*Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

   Determining whether a complaint states a plausible claim is a "context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S.

at 679.  The court must accept all facts alleged in the complaint as true and draw all reasonable

inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008)

(per curiam).  However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere
> conclusory statements, do not suffice."  A complaint must therefore contain more
> than "naked assertion[s] devoid of further factual enhancement."  Pleadings that
> contain "no more than conclusions . . . are not entitled to the assumption of truth"
> otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting

*Iqbal*, 556 U.S. at 678–79).  Thus, a complaint that offers "labels and conclusions" or "naked

assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556

U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

   "A court's task" on a motion to dismiss "is to assess the legal feasibility of the complaint; it

is not to assess the weight of the evidence that might be offered on either side."  *Lynch v. City of New*

*York*, 952 F.3d 67, 75 (2d Cir. 2020).  "The purpose of Rule 12(b)(6) is to test, in a streamlined

fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a

contest regarding its substantive merits.  The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

Finally, on a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint."  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006).  But a court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference."  *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)).  A court may also consider a document "solely relie[d]" on by the plaintiff if it "is integral to the complaint."  *Id.*  (quotation and brackets omitted).  A document is "integral to the complaint" if the complaint "relies heavily" on the document's "terms and effect."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).  A plaintiff must "*rely* on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough."  *Nicosia*, 834 F.3d at 231 (emphasis added) (quoting *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006)).  Here, as the CBA, SCC, Term Sheet, and COVID Policies are attached to the first amended complaint as exhibits, the Court considers those agreements in evaluating Defendants' motions to dismiss.

Because he is proceeding pro se, the Court must liberally construe Mr. Sullivan's allegations and "interpret[] [them] to raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in original); *see also Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be liberally construed' . . . ." (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  Nevertheless, dismissal of a pro se complaint is appropriate where a plaintiff has clearly failed to meet the minimum pleading requirements.  *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)).

## III.    DISCUSSION

Mr. Sullivan asserts claims against his union and his employer.  As discussed below, many of Mr. Sullivan's claims are preempted by section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (the "LMRA").  His remaining federal claim is one for a breach of the duty of fair representation (the "DFR") by Mr. Wheeler, his union representative.  "Under federal labor law, an employee may bring a complaint against her union and/or her employer alleging (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation in redressing her grievance against the employer." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 128 F.3d 110, 113–14 (2d Cir. 1997) (citing *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 163–64 (1983); *Vaca v. Sipes*, 386 U.S. 171, 184–86 (1967)).  "Section 301 of the [LMRA] governs the employer's duty to honor the collective bargaining agreement, and the duty of fair representation is implied under the scheme of the National Labor Relations Act (the 'NLRA')." *Id.* (citing *DelCostello*, 462 U.S. at 164).

Because he has alleged "violations on the part of" both the union and the employer, Mr. Sullivan's suit is a hybrid section 301/DFR action.  *See id.* at 114.[11]  Notably, "[t]he limitations period on this 'hybrid § 301/DFR' action is six months, which begins to run when the employee knew or should have known of the breach of the duty of fair representation." *Id.* (citing *DelCostello*, 462 U.S. at 169; *Cohen v. Flushing Hosp. & Med. Ctr.*, 68 F.3d 64, 67 (2d Cir. 1995); *King v. New York Tel. Co.*, 785 F.2d 31, 33 (2d Cir. 1986)).  For the reasons that follow, Mr. Sullivan's hybrid DFR/section 301 claims are dismissed for failure to comply with the statute of limitations.

---

[11] "The law is clear that regardless of who is named as a defendant, a hybrid claim is presented if an employee has a cause of action against both the employer and the union, where the two claims are inextricably linked, and where the case to be proved is the same against both." *McKee v. Transco Prod., Inc.*, 874 F.2d 83, 86 (2d Cir. 1989); *see also Arnold v. 1199 SEIU*, 420 F. App'x 48, 51 (2d Cir. 2011) (summary order) (same).

### A.  Claims Preempted by Section 301 of the LMRA

Many of Plaintiff's state-law causes of actions are preempted by section 301 of the LMRA.

Section 301 of the LMRA states:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties . . . .

29 U.S.C. § 185(a).  Section 301 "preempts claims that are 'inextricably intertwined with consideration of the terms of [a] labor contract.'"  *Wall v. Constr. & Gen. Laborers' Union, Loc. 230*, 224 F.3d 168, 178 (2d Cir. 2000) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985)); *see also Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988) (holding that "an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement").  Any suit in state court "alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law."  *Allis-Chalmers Corp.*, 471 U.S. at 210 (citing *Loc. 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 102 (1962)).  "A state rule that purports to define the meaning or scope of a term in a contract suit therefore is pre-empted by federal labor law."  *Id.*  Moreover, "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort."  *Id.* at 211.  "Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract."  *Id.*

When "resolution of the state-law claim does not require construing the collective-bargaining agreement," section 301 does not preempt state law.  *Lingle*, 486 U.S. at 407.  It is only when the state-law claim is "founded directly on rights created by collective-bargaining agreements," *Caterpillar*

*Inc.*, 482 U.S. at 394, or "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract" that the state-law claim is preempted by § 301, *Allis-Chalmers Corp.*, 471 U.S. at 220; *see also Vera v. Saks & Co.*, 335 F.3d 109, 114 (2d Cir. 2003) (same). A state-law claim would not "be preempted if its application required mere referral to the CBA for 'information such as rate of pay and other economic benefits that might be helpful in determining the damages.'" *Vera*, 335 F.3d at 115 (quoting *Lingle*, 486 U.S. at 413 n.12). Nor are state-law claims necessarily preempted by section 301 if the state-law right or obligation "exist[s] independently of" the labor contract. *See Allis-Chalmers Corp.*, 471 U.S. at 212–14; *accord United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 369–71 (1990).

For the reasons that follow, Plaintiff's causes of action for (1) tortious interference with contractual relations, (2) breach of the implied covenant of good faith and fair dealing, (3) negligence and negligent misrepresentation, (4) fraud, and (5) concerted-action liability are preempted by section 301 of the LMRA.

### 1. Tortious Interference

Plaintiff's claim against all defendants for tortious interference is preempted by the LMRA because it is inextricably intertwined with the CBA—that is, the contract that Mr. Sullivan alleges was breached and tortiously interfered with. "The elements of tortious interference with contractual relations are (1) the existence of a contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible, and (4) damages to the plaintiff." *Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*, 873 N.Y.S. 2d 679 (2d Dep't 2009) (quoting *Bayside Carting v. Chic Cleaners*, 660 N.Y.S. 2d 23 (2d Dep't 1997)) (internal quotation marks omitted); *see also D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 65 (2d Cir. 1998) (holding that actual breach of the contract is an element of tortious interference).

Here, Mr. Sullivan argues that Mr. Wheeler and the Met Defendants interfered with the "Agreement"—consisting of the CBA, the SCC, and the Term Sheet—when they negotiated and entered into the COVID Policies, which Mr. Sullivan argues caused a breach of the Agreement. *See* FAC ¶¶ 15–18, 82–113. Specifically, he argues that in enacting the COVID Policies, the defendants "intentionally induce[d] the Met to withhold [his] compensation" and then "terminate[d] [his] employment," which "interfer[ed]" with his rights under the CBA to be terminated only for good cause or vocal deterioration. *See* FAC ¶¶ 64, 114–16.

In this way, Mr. Sullivan brings a "tortious interference claim where the alleged breach is of the CBA itself, thereby requiring interpretation of the CBA and warranting preemption under § 301." *See Ferrara v. Leticia, Inc.*, No. 09-CV-3032 RRM CLP, 2012 WL 4344164, at *7 (E.D.N.Y. Sept. 21, 2012) (collecting cases); *see also Meier v. Premier Wine & Spirits, Inc.*, 371 F. Supp. 2d 239, 246 (E.D.N.Y. 2005) (finding that a claim brought for tortious interference was preempted by Section 301 because it "allege[d] that the defendants either breached or inferred with [Plaintiff's] employment contract," and "the only employment contract between [Plaintiff] and [his employer] was the CBA"); *Semper v. New York Methodist Hosp.*, 786 F. Supp. 2d 566, 583 (E.D.N.Y. 2011) (similar and collecting cases). Because the tortious interference claim alleges actual breach of the CBA,[12] the Court must necessarily interpret the terms of the CBA in assessing whether the defendants' conduct breached it. Thus, Mr. Sullivan's claim for tortious interference is preempted by Section 301 of the LMRA because it is "inextricably intertwined with consideration of the terms

---

[12] Mr. Sullivan frames his claims as violations of the parties' "Agreement," which consists of the CBA, SCC, and Term Sheet. *See* FAC ¶¶ 15–18, 82–113 (alleging tortious interference with the "Agreement"). Regardless of which specific document Mr. Sullivan alleges was interfered with, the analysis is the same: the SCC states that it "is subject to and includes all the terms and conditions of Sections One and Three of the Collective Bargaining Agreement between [t]he Met and AGMA." Dkt. No. 56-1 at 1. And the Term Sheet itself was a labor contract negotiated between AGMA and the Met. *See* Dkt. No. 56-3 at 5 (noting that "[t]he AGMA Board of Governors has ratified a new collective bargaining agreement with the Met," which "was approved by union leadership after a tentative agreement was reached May 11 and following a shop vote of all work groups of AGMA Artists at the Met," including choristers); Dkt. No. 56-3 at 1–4 (the Term Sheet signed by representatives of the Met and AGMA).

of" the CBA, *see Allis-Chalmers Corp.*, 471 U.S. at 213, and its "resolution . . . is substantially

dependent upon analysis of the terms of an agreement made between the parties in a labor

contract," *id.* at 220.[13]

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

Likewise, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is

preempted by section 301. "Implicit in all contracts is a covenant of good faith and fair dealing in

the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y. 2d 384, 389 (1995). "The

implied covenant of good faith and fair dealing obligates a promisor to fulfill 'any promises which a

reasonable person in the position of the promisee would be justified in understanding were included'

in the contract." *19 Recordings Ltd. v. Sony Music Ent.*, 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016)

---

[13] In the section describing his cause of action for tortious interference, Mr. Sullivan additionally alleged violations of the New York City Health Code and miscellaneous "employer liability" and New York State "executive laws." *See, e.g.*, FAC ¶ 92 ("[Ms. S]ells failed to follow local determinative health regulations in violation of New York City Health Code §11.03, §11.05, §11.17, §11.23 between June 25, 2021 and August 16, 2021 and again starting on March 25, 2022."); *id.* ¶ 106 ("Pursuant to NY Employer Liability Law § 4 (2022), the experimental injections were and are not a '*necessary risk of the occupation or employment*' of claimant." (emphasis in original)); *see also id.* ¶¶ 52–57 (citing "New York Employer Liability Law § 4" and "New York Executive Law § 24"). The health code violations Mr. Sullivan cites are not briefed by any party; and even construing Mr. Sullivan's claims liberally, the Court is unaware of any plausible private cause of action under which the Met Defendants may be liable for health code violations, given the allegations in the complaint. Section 11.03 states that "[c]ases and carriers affected with" a list of "diseases and conditions of public health interest . . . shall be reported to the Department" of Health. *See* N.Y.C. Health Code § 11.03, available at https://www.nyc.gov/assets/doh/downloads/pdf/about/healthcode/health-code-article11.pdf [https://perma.cc/HN6R-CYTP]. Section 11.05 is similar, describing the contents of those reports. *See id.* § 11.05. There is no allegation in the complaint that the Met failed to report its cases of COVID-19 or otherwise. Section 11.17 describes "[c]ontrol measures," the "duty to isolate," and "isolation, quarantine, and examination orders." *See id.* § 11.17. There is no allegation that the Met failed to isolate or quarantine any individuals (nor is it clear that the Met would be required to do so under this section, which describes the duties of physicians and people "in charge of . . . medical facilit[ies]," as well as those "in charge of . . . other place[s] providing medical care," and those "in charge of a school, day care facility, camp or other congregate care setting with children . . . ."). Last, Section 11.23 authorizes the Commissioner of Health to "order the removal and/or detention of" "cases, contacts and carriers who are or may be a danger to public health." *See id.* § 11.23. There are no allegations in the complaint that suggest that the Met has in any conceivable way violated this provision. Nor do Mr. Sullivan's claims of violations of Section 4 of the New York Employers' Liability Law hold any water. *See* FAC ¶ 106 (arguing that "the experimental injections," that is to say, COVD-19 vaccines, "were and are not a 'necessary risk of the occupation or employment' of [Mr. Sullivan]"). This law states that "[a]n employee by entering upon or continuing in the service of the employer shall be presumed to have assented to the necessary risks of the occupation or employment and no others." N.Y. Employers' Liability Law § 4, available at https://www.nysenate.gov/legislation/laws/EML/4 [https://perma.cc/4WTE-S3RG]. And it describes how the defense of "assumption of risks by the employee" may be used in any "action brought to recover damages for personal injuries or for death resulting therefrom" owing to a work-related incident. *See id.* Mr. Sullivan has not alleged any personal injuries or death that he sustained while working at the Met. Nor has the Met asserted an "assumption of risks" defense under this statute.

(quoting *Dalton*, 87 N.Y.2d 384, 389).  This implied covenant is "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (citation and internal quotation marks omitted).  That being said,

> this covenant only applies where an implied promise is so interwoven into the contract "as to be necessary for effectuation of the purposes of the contract."  For this to occur, a party's action must directly violate "an obligation that may be presumed to have been intended by the parties."  However, "the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract."

*Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir. 2006) (quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).

Moreover, the implied covenant does not *add* to the contract; it only imposes an obligation "consistent with other mutually agreed upon terms in the contract."  *See Border v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–99 (2d Cir. 2005) (citations omitted); *see also Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08 CIV. 4341, 2009 WL 1054830, at *5–6 (S.D.N.Y. Apr. 17, 2009) (Sullivan, J.) ("Significantly, although this implied covenant bars actions not 'expressly forbidden' by the contract but undertaken in bad faith, it does not 'operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits.'  Accordingly, 'no obligation can be implied that would be inconsistent with other terms of the contractual relationship.'" (citations omitted)).

Here, Mr. Sullivan argues that the COVID Policies, "while not expressly forbidden by the Agreement, seek to permanently administer the property of [Mr. Sullivan] in order that he may fulfil the terms of [the] Agreement," consisting of the CBA, SCC, and Term Sheet.  *See* FAC ¶ 125; *see also id.* ¶¶ 15–18.  He argues that Mr. Gelb and Mr. Wheeler "attempted, *ultra vires*, to create and agree to [the COVID] Policy" and that in doing so, they breached the implied covenant of good faith and

fair dealing in the CBA. *See id.* ¶¶ 127, 133 (alleging that the "unauthorized negotiation, approval, and enforcement of [the COVID] Policy . . . deliberately prevent[ed] [Mr. Sullivan's] performance of [the] Agreement by barring [his] entrance to the worksite"); *id.* ¶ 134 (stating that Mr. Gelb "act[ed] deliberately and with full knowledge to enforce [the COVID Policies] . . . and withhold the benefits of [the] Agreement from [Mr. Sullivan]"). Mr. Sullivan additionally contends that the implied covenant was breached by the Met Defendants' and Mr. Wheeler's nonresponses to questions that Mr. Sullivan posed to them about the COVID Policies. *See id.* ¶¶ 140–50, 156.

In assessing whether Defendants breached any covenant of good faith and fair dealing implied in the CBA, the Court must analyze the contract itself. *See, e.g.*, *Thyroff*, 460 F.3d at 407–08 (noting that "this covenant only applies where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of the contract'"); *Border*, 418 F.3d at 198–99 (stating that the implied covenant only imposes an obligation "consistent with other mutually agreed upon terms in the contract" and does not add to the contract). Mr. Sullivan's claim for breach of the implied covenant of good faith and fair dealing concerns a covenant implied in the "Agreement," which consists namely of the CBA. This claim is therefore preempted by section 301 because it is "inextricably intertwined with consideration of the terms of" the CBA, *see Allis-Chalmers Corp.*, 471 U.S. at 213, and its "resolution . . . is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," *id.* at 220; *see also, e.g.*, *Allocco v. Dow Jones & Co.*, No. 02 CIV. 1029 (LMM), 2002 WL 1402084, at *6 (S.D.N.Y. June 27, 2002) (holding that a plaintiff's claim for breach of the implied covenant was preempted where "[t]he only contract that exists between plaintiff and defendants is the CBA and any implied obligation that may exist would be in aid of that agreement and would require interpretation of that agreement").[14]

---

[14] *See also Grehla v. Danbury Hosp.*, No. 3:22-CV-13 (KAD), 2023 WL 4273700, at *5 (D. Conn. June 29, 2023) (dismissing a claim for breach of the implied covenant of good faith and fair dealing "as preempted by the LMRA"); *Doyle v. United*

### 3. Negligence and Negligent Misrepresentation

Plaintiff's claims for negligence and negligent misrepresentation are also preempted by section 301 of the LMRA. "The elements of a negligence claim under New York law are: '(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.'" *Pasternack v. Lab'y Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir.), *as amended* (Nov. 23, 2015), *certified question accepted*, 26 N.Y.3d 1074 (2015), *and answered*, 27 N.Y.3d 817 (2016) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (other citations omitted)). "If the defendant owes no duty to the plaintiff, the action must fail." *Id.* Similarly, the elements of a claim for negligent misrepresentation include that "the defendant had a duty, as a result of a special relationship, to give correct information." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).[15] And in New York, "[a]n employer has the right to terminate employment at will at any time and for any reason or no reason, except as that right may have been limited by express agreement with the employee or in a collective bargaining agreement of which the employee is a beneficiary." *O'Connor v. Eastman Kodak Co.*, 65 N.Y.2d 724, 725 (1985).

In support of his negligence claim against the Met Defendants, Mr. Sullivan argues that the Met Defendants have a "duty" to be aware of and to comply with "public policy and statutory law that affect performing artists." FAC ¶¶ 287–89. He argues that the Met Defendants violated this "duty" in failing to comply with Emergency Executive Order 62 and New York Executive Law § 24, *see* FAC ¶¶ 290–96, and he argues that the Met Defendants owed this duty "independent of [the] contract," *id.* ¶¶ 299, 301. But Executive Order 62 merely states that certain individuals "shall be

---

*Airlines, Inc.*, 914 F. Supp. 2d 325, 337 (E.D.N.Y. 2012) ("Where, as here, a plaintiff has not identified any source of her claimed contract rights other than a collective bargaining agreement, plaintiff's claims must be construed as preempted by LMRA § 301.").

[15] "Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Invs., Inc.*, 227 F.3d at 20.

exempt from the Order of the Commissioner of Health dated December 13, 2021, relating to requiring COVID-19 vaccination in the workplace." *See* Emergency Executive Order No. 62 § 3(e) (Mar. 24, 2022).[16]  This executive order does not require employers to exempt employees from any vaccination requirements in the workplace; it simply modifies the prior, December 13, 2021 order of the Commissioner of Health, which had required COVID-19 vaccination in certain workplaces. *See* Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination in the Workplace (Dec. 13, 2021).[17]  And while New York Executive Law § 24 provides procedures by which the chief executive may declare a local state of emergency or enact other emergency orders, this statute, too, does not impose any duty on employers to prescribe (or not prescribe) any particular vaccination policy in the workplace.  Although "a plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of that agreement," *see Caterpillar Inc.*, 482 U.S. at 396, Mr. Sullivan fails to adequately plead that the Met Defendants owe him any duties beyond those prescribed by the CBA.  *Cf. Lingle*, 486 U.S. at 410 (holding that "as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes").  The New York state law and executive order that Mr. Sullivan cites do not prescribe any such duties.

Rather, the negligence claims in this case are akin to those of *Salamea v. Macy's East, Inc.*  The *Salamea* Court found that a plaintiff's negligence claim was preempted by section 301 because the plaintiff failed to allege any duties owed by the employer beyond those rooted in the CBA.  *See* 426 F. Supp. 2d 149, 154 (S.D.N.Y. 2006).  Here, as in *Salamea*, if Mr. Sullivan "was an at will employee, [he] could be terminated for any reason or no reason at all . . . .  Therefore, if the defendants owed

---

[16] Available at https://www.nyc.gov/office-of-the-mayor/news/062-003/emergency-executive-order-62 [https://perma.cc/Y2T6-UM4G].

[17] Available at https://www.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-workplace-requirement.pdf [https://perma.cc/8QJ9-HURC].

any duty of care to [Plaintiff], that duty arose from the CBA's requirement that an employee not be terminated without just cause." *Id.* Indeed, Mr. Sullivan's CBA established a policy that choristers may be terminated only for just cause or vocal deterioration. *See* FAC ¶ 64; CBA at III-25–26 (native pagination). And "the plaintiff fails to provide any basis for the defendants to have a duty of care with respect to [his] termination" that goes beyond any duties prescribed by the CBA. *Salamea*, F. Supp. 2d at 154. Thus, "to allow the plaintiff to proceed with a negligent termination claim where the only possible basis for such a claim is the CBA 'would elevate form over substance and allow parties to evade the requirements of 301.'" *Id.* (quoting *Allis-Chalmers*, 471 U.S. at 211). Accordingly, here as in *Salamea*, Plaintiff's claims for negligence and negligent misrepresentation are preempted by section 301.[18]

### 4. Fraud

And Plaintiff's claims for fraud are preempted by section 301. "Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996)). In support of his fraud claim, Mr. Sullivan contends that Mr. Gelb "secretly colluded with defendant [W]heeler of AGMA to add an unconscionable covenant, the [COVID] Policy, to the already-ratified Collective Bargaining Agreement," FAC ¶ 363;

---

[18] Mr. Sullivan argues that *Salamea* is distinguishable because there, "the Court stated, 'the CBA contain[ed] detailed requirements for an employee to be eligible for vacation benefits'" and "the Plaintiff in *Salamea* did not even attempt to pursue the grievance and arbitration process." *See* Response to Met Defendants at 13 (quoting *Salamea*, 426 F. Supp. 2d at 155). While an accurate description of *Salamea*'s facts, this response is irrelevant to the fact that the *Salamea* Court concluded that addressing the central issues in the case required interpretation of the CBA. Because there was a dispute as to whether the plaintiff-employee in *Salamea* was entitled to take the vacation days that she took, and "whether she followed the appropriate procedures" for doing so in order to be eligible for vacation pay under the CBA, the court concluded that "[t]he resolution of these disputes will require interpretation of the CBA, and thus, [were] preempted by [section] 301." *Salamea*, 426 F. Supp. 2d at 155. The pursuit of the grievance process is not relevant to this question of preemption.

and that the Met Defendants and Mr. Wheeler "colluded to enforce" this policy, *id.* ¶ 365; *see also id.* ¶¶ 315, 330.  He further alleges that the defendants together "present[ed] the policy as coming exclusively from the Met."  *Id.* ¶ 366; *see also id.* ¶ 369 (contending that Mr. Gelb and Ms. Sells "fraudulently omitted defendant [W]heeler's involvement with attempted negotiation of and agreement to [the COVID] Policy").  And he states that the defendants did this "fraudulently and with full knowledge that the Term Sheet authorized them only to '*discuss* the return-to-work safety protocols including the Met's mandatory vaccination proposal.'"  *Id.* ¶ 371 (emphasis in original).  Last, in support of his fraud claim, Mr. Sullivan proffers the fact that the defendants did not respond to a number of questions he posed to them about the COVID Policies.  *See, e.g., id.* ¶¶ 418, 434.

Mr. Sullivan's claim of fraud is clearly "premised on the violation of duties in the CBA," as in *Allis-Chalmers.  See Foy v. Pratt & Whitney Grp.*, 127 F.3d 229, 235 (2d Cir. 1997) (citing *Allis-Chalmers*, 471 U.S. at 215); *see also Gorodkin v. Q-Co. Indus.*, No. 89 CIV. 8033 (LMM), 1992 WL 122769, at *12 (S.D.N.Y. May 27, 1992) ("[Plaintiff's fraud claim is founded directly on rights created by the Agreement, as opposed to rights which he possesses independently, and clearly implicates the terms of that Agreement. . . . .  As a result, the state fraud claim . . . must either be treated as a § 301 claim or dismissed as preempted by federal labor-contract law.").  Resolution of this state-law fraud claim "require[s] construing the collective-bargaining agreement."  *See Lingle*, 486 U.S. at 407.  And the claim is "founded directly on rights created by collective-bargaining agreements," *Caterpillar Inc.*, 482 U.S. at 394, such that its "resolution . . . is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," *Allis-Chalmers Corp.*, 471 U.S. at 220.  Accordingly, this claim is preempted by section 301.  *See id.*; *see also Vera*, 335 F.3d at 114.[19]

---

[19] This is unlike *Wynn v. AC Rochester*, in which the Second Circuit found that even though "determining [the plaintiff's] claim require[d] consulting the CBA," "there [was] no genuine issue between the parties concerning interpretation of the

### 5. Concerted-Action Liability

Mr. Sullivan's claim for "concert of action," which the Court construes liberally as a claim for concerted-action liability,[20] is also preempted by section 301. "Concerted-action liability under New York law is based on the principle that '[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer . . . are equally liable with him.'" *Pittman by Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998) (quoting *Bichler v. Eli Lilly & Co.*, 55 N.Y.2d 571, 580 (1982)). "The elements of concerted-action liability are (1) an express or tacit agreement 'to participate in a common plan or design to commit a tortious act,' (2) tortious conduct by each defendant, and (3) the commission by one of the defendants, in pursuance of the agreement, of an act that constitutes a tort." *Id.* (quoting *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d at 295 (1992)).

This claim, too, is "inextricably intertwined with consideration of the terms of [a] labor contract." *See Wall*, 224 F.3d at 178 (internal quotation marks and citations omitted). In support of this claim, Mr. Sullivan alleges that the Met Defendants and Mr. Wheeler "act[ed] together and in their individual capacities to create, promote, and enforce [the COVID] Policy . . . ." FAC ¶ 491; *see also id.* ¶ 503 (alleging that Mr. Wheeler "work[ed] in concert with representatives of the Met" to

---

CBA," such that a unionized plaintiff-employee's claim for fraud was not preempted by section 301. *See* 273 F.3d at 158. That is to say, in *Wynn*, the plaintiff's claim was "not a disguised claim for breach of the CBA," but rather, his claim was that the defendants "misled him . . . by misrepresenting" the benefits that were available to the plaintiff under his CBA. *Id.* at 159. Thus, the *Wynn* Court concluded that the fraud claim was not preempted by section 301 where "neither [the plaintiff's] claim nor [the defendant's] defense requires interpretation of the CBA." *Id.* Here, by contrast, both the plaintiff's claim and the defendants' defense *do* require interpretation of the CBA: Mr. Sullivan's claim is founded on rights conferred by the CBA, and resolving the claim requires analyzing the terms of the CBA. Namely, the Court must consider the CBA to assess the Met and AGMA's challenged authority to promulgate the COVID Policies, and their authority to subsequently place him on unpaid leave and terminate him for noncompliance with those policies, as well as Mr. Sullivan's right under the CBA to be terminated only for just cause or vocal deterioration. Mr. Sullivan's claim is therefore preempted, unlike that in *Wynn*.

[20] Because Mr. Sullivan is proceeding pro se, the Court must construe his submissions "liberally" and interpret them "to raise the strongest arguments that they suggest." *Triestman*, 470 F.3d at 474 (citations omitted); *see also, e.g., Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (similar). Courts must afford pro se plaintiffs "special solicitude." *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994). Accordingly, the Court construes his "concert of action" claim as a concerted-liability claim.

"attempt to negotiate and agree to" the policy); *id.* ¶ 511 (alleging that all the defendants "acted . . . with a common understanding to intentionally ignore awareness of harm to [Mr. Sullivan], expressed by way of emails and notices from [him], by enforcing" the COVID Policies).  To the extent that the defendants had any "agreement" or "common plan or design to commit a tortious act," this agreement itself consists of the CBA and the parties' negotiations undertaken with respect to it.  *See Grayson*, 149 F.3d at 122.  Accordingly, Plaintiff's claim for concerted-action liability is preempted by section 301 because it is "founded directly on rights created by collective-bargaining agreements," *Caterpillar Inc.*, 482 U.S. at 394, such that its "resolution . . . is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," *Allis-Chalmers Corp.*, 471 U.S. at 220.

### 6.  Assault

The Court need not analyze whether Mr. Sullivan's claim for assault is preempted by section 301 because regardless, this claim is inadequately pleaded under Rule 12(b)(6).  "Under New York law, civil assault 'is an intentional placing of another person in fear of imminent harmful or offensive contact.'"  *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021) (quoting *Charkhy v. Altman*, 252 A.D.2d 413 (1st Dep't 1998).  "While '[a]n action for an assault need not involve physical injury, but only a grievous affront or threat to the person of the plaintiff,' words, without some menacing gesture or act accompanying them, ordinarily will not be sufficient to state a cause of action alleging assault."  *Gould v. Rempel*, 99 A.D.3d 759, 760 (2d Dep't 2012) (citations omitted).[21]

Mr. Sullivan argues that the Met Defendants "intentionally placed [Mr. Sullivan] in apprehension of imminent harmful contact by way of a 'Hobson's choice' of consenting, under duress, to accept known health risks of experimental injections *or* be forced to accept unpaid leave,

---

[21] "Civil battery 'is an intentional wrongful physical contact with another person without consent.'"  *Tardif*, 991 F.3d at 410 (quoting *Charkhy*, 678 N.Y.S.2d at 41).

termination of tenured employment, and ruination of his career." FAC ¶ 454 (emphasis in original). He states that he "fear[ed] the commission of a battery, by way of experimental injection, that would permanently alter and potentially harm his bodily property;" *id.* ¶ 455, and that he was "coerced . . . to make the impossible choice of consenting, under duress, to the commission of a battery *or* lose his livelihood," *id.* ¶ 456 (emphasis in original).

Even when drawing all reasonable inferences in Mr. Sullivan's favor, the FAC supplies no allegations that the Met Defendants engaged in any "menacing gesture or act," *see Gould*, 99 A.D.3d at 760, to suggest any intent whatsoever of placing Mr. Sullivan "in fear of imminent harmful or offensive contact," *Tardif*, 991 F.3d at 410. As the Met Defendants correctly observe in their brief: "what is at issue is the Met's [COVID P]olicy, not an attempt by the Met to wield a syringe and actually inject Plaintiff." Met Defendants' Mem. at 21 n.17. Because Mr. Sullivan failed to adequately plead that the Met Defendants engaged in any conduct that "intentiona[ly] plac[ed] him] in fear of imminent harmful or offensive contact," his claim for assault is dismissed.[22] *See Tardif*, 991 F.3d at 410.

### B. Duty of Fair Representation Claim

Mr. Sullivan also asserts a claim against Mr. Wheeler for breach of the duty of fair representation.[23] "Under federal common law, unions owe their members a duty of fair

---

[22] The FAC's imitation of some of the words in this legal standard, *see, e.g.*, FAC ¶ 454, is a legal conclusion that need not be accepted as true by the Court. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Mr. Sullivan fails to allege *facts* that adequately plead that he was, in fact, intentionally placed "in fear of imminent harmful or offensive contact" through a physically forced vaccination or otherwise. *See Tardif*, 991 F.3d at 410.

[23] As noted in the Court's ruling on the motion to remand, Dkt. No. 100, the Court construes Mr. Sullivan's claims against Mr. Wheeler as alleging breach of the duty of fair representation. *See Ruotolo*, 28 F.3d at 8; FAC ¶ 95 (alleging that, at the June 18, 2021 meeting, Mr. Wheeler "act[ed] in bad faith and breached his duty of fair representation"); *id.* ¶ 138 (similar); *see also Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 344 (S.D.N.Y. 2014) ("In evaluating a pro se complaint, a court is not limited to the causes of action specified by the plaintiff, but instead 'must construe it liberally, applying less stringent standards than when a plaintiff is represented by counsel,' and must construe it to raise the strongest claims it suggests." (citations omitted)); *DiPetto v. U.S. Postal Serv.*, 383 F. App'x 102, 103 (2d Cir. 2010) (summary order) ("[W]hile pro se complaints must contain sufficient factual allegations to meet the plausibility standard, [courts] should look for such allegations by reading pro se complaints with 'special solicitude' and interpreting them to raise the 'strongest [claims] that they suggest.'" (citations omitted)).

representation ('DFR'), which derives 'from the union's statutory role as exclusive bargaining agent.'" *Dillard v. SEIU Local 32BJ*, 15-cv-4132-CM, 2015 WL 6913944, at \*4 (S.D.N.Y. Nov. 6, 2015) (quoting *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 74 (1991)).   "An employee's claim against a union for breaching its duty of fair representation (a 'DFR claim') is a cause of action 'implied under the scheme' of the National Labor Relations Act ('NLRA'), 29 U.S.C. §§ 151–169." *Kalyanaram v. Am. Ass'n of Univ. Professors at New York Inst. of Tech., Inc.*, 742 F.3d 42, 46 (2d Cir. 2014) (quoting *DelCostello*, 462 U.S. at 164 & n.14).   "The duty of fair representation is a 'statutory obligation' under the NLRA, requiring a union 'to serve the interests of all members without hostility or discrimination . . . , to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 387–88 (2d Cir. 2015) (quoting *Vaca*, 386 U.S. at 177).   "A union breaches its duty of fair representation if its actions with respect to a member are arbitrary, discriminatory, or taken in bad faith." *Id.* at 388.

Mr. Sullivan's DFR claim is twofold.  First, he argues that Mr. Wheeler "act[ed] in bad faith and breached his duty of fair representation to [Plaintiff] by attempting to negotiate, *ultra vires*, with men and women of the Met, the extra-contractual [COVID] Policy" at the June 18, 2021 meeting. FAC ¶ 95; *see also id.* ¶¶ 315, 323–24, 330, 371, 513.  And he alleges that Mr. Wheeler failed to notify him of AGMA's agreement to the COVID Policies.  *Id.* ¶ 96; *see also id.* ¶ 35 (alleging that the COVID Policy "makes no mention of AGMA, [Mr. W]heeler, or any involvement by any union . . . other than a footnote that states, 'This policy has been sent to all unions representing Met employees'"); *id.* ¶ 37 (alleging that, as a result, Mr. Sullivan "believe[d] that the [COVID] Policy was issued unilaterally by the Met").  The Court terms this Mr. Sullivan's "Negotiation DFR Claim."

Second, Mr. Sullivan contends that Mr. Wheeler failed to adequately represent him by failing "to find an accommodation" for Mr. Sullivan to the COVID Policies, *id.* ¶ 97, and failing to "pursue [his] claims . . . in the grievance process or in arbitration," *id.* ¶ 103.  He argues that Mr. Wheeler

could not fairly represent him in the grievance process because "by his unauthorized attempt to negotiate and agree, *ultra vires*," to the COVID Policies, Mr. Wheeler "create[d] a conflict of interest that prevents fair and unbiased grievance and arbitration procedures." *Id.* ¶ 102; *see also id.* ¶ 345 (contending that Mr. Sullivan "determined that his claims would be tainted in arbitration" because Mr. Wheeler's "fraudulent omission"—that he negotiated the COVID Policies with the Met on behalf of AGMA—"surfaced during the course of [Plaintiff's] grievance process"); *id.* ¶ 353 (arguing that this "conflict of interest," which Mr. Wheeler allegedly "attempt[ed] to hide," means that "utilizing AGMA representation in the arbitration process would have caused harm to" Mr. Sullivan).  The Court refers to this as the "Representation DFR Claim"—and, together with his Negotiation DFR Claim, the "DFR Claims."

The DFR Claims must be dismissed for several reasons.  First, any DFR claim cannot be asserted against Mr. Wheeler, as "[t]he Supreme Court has long held that 'union agents' are not personally liable to third parties for acts performed on the union's behalf in the collective bargaining process." *Morris v. Loc. 819, Int'l Bhd. of Teamsters*, 169 F.3d 782, 784 (2d Cir. 1999) (citing *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 247–49 (1962), *overruled in part on other grounds by Boys Markets, Inc. v. Retail Clerk's Union, Local 770*, 398 U.S. 235, 241 (1970).  This immunity "remain[s] in effect even if the union had not authorized the actor's conduct." *Id.* (citing *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 417 (1981)).  In other words, there exists "a shield of immunity for individual union members in suits for breach of the duty of fair representation." *Id.*  Accordingly, because Mr. Sullivan has named Mr. Wheeler and not AGMA as a party in the case, the claims against Mr. Wheeler are dismissed.  *See also Fowlkes*, 790 F.3d at 388 n.10 ("A duty of fair representation cause of action does not lie against the individual defendants . . . .  Such a claim may be stated only against a union.").

Second, even if Mr. Sullivan brought suit against AGMA, the DFR Claims would

nonetheless fail for failure to comply with the statute of limitations, as discussed below.

### C.  Failure to Comply with the Statute of Limitations

Mr. Sullivan's hybrid section 301/DFR action, consisting of the claims preempted by the

LMRA and the DFR Claims, is dismissed for failure to comply with the statute of limitations.

Again, "[t]he limitations period on this 'hybrid § 301/DFR' action is six months, which begins to

run when the employee knew or should have known of the breach of the duty of fair

representation." *White*, 128 F.3d at 114; *accord Kalyanaram*, 742 F.3d at 46.  "[I]t is well settled that"

the six-month limitations period begins from that time "even if some possibility of nonjudicial

enforcement remained." *Cohen*, 68 F.3d at 67 (internal quotation marks and citations omitted).

Moreover, "[w]here a union refuses or neglects to assist a union member, decides to stop assisting a

member, or acts against the interests of a member, a breach of duty by the union is apparent to the

member at the time she learns of the union action or inaction about which she complains." *Ghartey*

*v. St. John's Queens Hosp.*, 869 F.2d 160, 165 (2d Cir. 1989) (collecting cases) (citations omitted); *see also*

*Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 278–79 (2d Cir. 2004)

(noting that an alleged DFR "breach occurs when the union acts against the interests of its

members"); *Arnold v. 1199 SEIU*, 420 F. App'x 48, 51 (2d Cir. 2011) (summary order) (stating that

the plaintiff's "hybrid claim accrued when he 'knew or reasonably should have known' that the

Union failed to fairly 'handle' his grievance" (citations omitted)).

Here, the statute of limitations for Mr. Sullivan's LMRA claims and DFR Claims began to

run no later than October 5, 2022.  Accepting all facts alleged in the complaint as true, and drawing

all reasonable inferences in Mr. Sullivan's favor, *see Burch*, 551 F.3d at 124, Mr. Sullivan knew of Mr.

Wheeler's involvement in negotiations of the COVID Policies by October 5, 2022, *see* FAC ¶ 39.[24] And AGMA's Eastern Counsel, Ms. Hollister, informed Mr. Sullivan even *earlier*—on September 27, 2022—that "AGMA and the Met agreed to a Policy in a meeting on June 18, 2021, and . . . this policy is reflected in the document that Sells distributed on June 25." *Id.* ¶ 335. Thus, the limitations period for Mr. Sullivan to bring his LMRA claims and DFR Claims expired six months later: either (1) March 27, 2023, as measured from the date Ms. Hollister informed Mr. Sullivan of AGMA's involvement in the policy's negotiation and enactment, or more charitably, (2) April 5, 2023, measured from the date Mr. Sullivan learned of Mr. Wheeler's involvement, specifically. Under either date, his claim is untimely: Mr. Sullivan waited until May 7, 2023 to file his claims in the Supreme Court of New York. *See* Dkt. No. 1-1.

These claims are time-barred notwithstanding Mr. Sullivan's failure-to-represent argument. Mr. Sullivan argued that Mr. Wheeler subsequently could not represent him fairly in his grievance proceedings because of the supposed "conflict of interest" that Mr. Wheeler's participation in the negotiation of the COVID Policies engendered. *See* FAC ¶¶ 102, 150–52, 345, 353. This is not a claim that Mr. Wheeler failed to represent him for some separate reason—rather, Mr. Wheeler could not possibly represent him adequately, Mr. Sullivan argues, *because* of Mr. Wheeler's apparent "breach" of the CBA, by virtue of his earlier negotiations. In other words, the "union action or inaction" complained of is not conduct during the grievance process, but the negotiations that predated that process. *See Ghartey*, 869 F.2d at 165. Accordingly, both DFR Claims are time-barred. *See also, e.g.*, *Ramey*, 378 F.3d at 278–79 (holding that the six-month statute of limitations began when

---

[24] Mr. Wheeler argues that the applicable date is instead June 28, 2021, the date on which Mr. Sullivan "declin[ed]" the COVID Policies in an email to Ms. Sells. *See* Mr. Wheeler's Mem. at 15 (citing FAC ¶¶ 27, 252, 381, 466). But, as Mr. Wheeler acknowledges, Mr. "Sullivan contends that he did not become aware of Wheeler's participation in the negotiation of the [COVID] Policy until October 5, 2022." *Id.* n.3 (citing FAC ¶ 39). The Court treats the latter date as applicable to his knowledge of Mr. Wheeler's involvement because the Court must accept all facts alleged in the complaint as true. *See Burch*, 551 F.3d at 124.

plaintiffs knew or should have known that a particular policy's "negotiations had begun and a breach occurred"); *Flanigan v. International Bhd. of Teamsters, Truck Drivers Local 671*, 942 F.2d 824, 827 (2d Cir. 1991) (holding that because plaintiffs "became aware no later than August 1988 that both [the employer] and the Union interpreted the [CBA]" in a particular manner that plaintiffs claimed violated their rights, "[i]f [plaintiffs] had a cause of action, it accrued by that time"); *Eatz v. DME Unit of Loc. Union No. 3 of Int'l Bhd. of Elec. Workers, AFL-CIO*, 794 F.2d 29, 33 (2d Cir. 1986) ("[I]f plaintiffs' claims rested . . . solely on the activities of the union and [the employer] during the negotiations for and ratification of the several agreements, such claims would have been time-barred at the latest six months after ratification of the last agreement.").

### D. Equitable Tolling

Although the statute of limitations for hybrid DFR/section 301 claims may be tolled in some circumstances, *see, e.g.*, *White*, 128 F.3d at 115; *Cohen*, 68 F.3d at 68, the Court finds that equitable tolling is inappropriate here. "Under the doctrine of equitable tolling, a complainant may be allowed to file his or her claim outside the applicable limitations period if, because of some action on the defendant's part, the complainant was unaware that the cause of action existed." *Long v. Frank*, 22 F.3d 54, 58 (2d Cir. 1994). Equitable "tolling might be appropriate only where the defendant has actively misled the plaintiff respecting the cause of action, or where the plaintiff has in some extraordinary way been prevented from asserting his rights, or has raised the precise statutory claim in issue but has mistakenly done so in the wrong forum." *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 109 (2d Cir. 1978) (citing *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO, Loc. 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 237 (1976)); *see also Hosokawa v. Screen Actors Guild-Am., Fed'n of Television & Radio, Artists*, 234 F. Supp. 3d 437, 443 (S.D.N.Y. 2017), *aff'd sub nom.* 745 F. App'x 433 (2d Cir. 2018) ("Courts only apply equitable tolling in rare and exceptional circumstances . . . ." (internal quotation marks and citations omitted)).

Plaintiff's contention that Mr. Wheeler and AGMA concealed their involvement in negotiating the COVID Policies, *see* FAC ¶¶ 345, 353, does not suffice to toll the limitations period. "Once a plaintiff learns of his union's breach of its duty of fair representation, the union's subsequent failure to actually represent the plaintiffs 'cannot be treated as a continuing violation that preclude[s] the running of the limitations period.'" *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir. 1995) (quoting *Flanigan*, 942 F.2d at 827).  Nor is the limitations period tolled merely because Mr. Sullivan "determined that his claims would be tainted in arbitration."  *See* FAC ¶ 345; *see also id.* ¶¶ 150–52 (contending that Mr. Wheeler "could not fairly represent [his] claims . . . in arbitration," *id.* ¶ 150, and that Mr. Wheeler "deliberate[ly]" refused to pursue Mr. Sullivan's claims, *id.* ¶ 152). Again, the reason that Mr. Sullivan argued Mr. Wheeler could not fairly represent him in the grievance process was because Mr. Wheeler "create[d] a conflict of interest that prevents fair and unbiased grievance and arbitration procedures" by the mere fact that Mr. Wheeler "attempt[ed] to negotiate and agree" to the COVID Policies.  *Id.* ¶ 102.  And Mr. Sullivan became aware of his union and his union representative's involvement on either on September 27, 2022 (AGMA's involvement) or October 5, 2022 (Mr. Wheeler's involvement), as discussed above.  Thus, equitable tolling is inappropriate because from either of those dates, Mr. Sullivan was aware of an alleged DFR breach—notwithstanding any alleged "attempt to hide" the union's involvement at an earlier stage. *See* FAC ¶ 353.[25]

Nor does Mr. Sullivan's January and February 2023 correspondence with Mr. Wheeler suffice to toll the statute of limitations.  *See, e.g.*, FAC ¶¶ 140–46 (alleging that Mr. Sullivan sent Mr. Wheeler a series of emails stating that the vaccines "cause [him] harm," asking if Mr. Wheeler "inten[ded] to be complicit with . . . [t]he Metropolitan Opera" in establishing the COVID Policies,

---

[25] *Cf. Schermerhorn v. Metro. Transp. Auth.*, 156 F.3d 351, 354 (2d Cir. 1998) (finding equitable tolling inappropriate where "in any event, the Union's grievance procedure," had the plaintiff pursued and completed it, "could not have remedied the Union's breach and the employer's collusion through rescission of the allegedly unlawful agreement or otherwise").

and requesting records of the June 18, 2021 meeting).  Mr. Sullivan asserts that the statute of

limitations "did not start until February 13, 2023, the last due date given to Wheeler by which he

could respond to Claimant's written notices."  Response to Wheeler at 9.  But it is immaterial that

Mr. Wheeler "did not answer" these questions, FAC ¶ 147, by Mr. Sullivan's self-imposed deadline

of February 2023, *id.* ¶ 152.  The statute of limitations is not tolled by informal correspondence.[26]

*See Legutko v. Loc. 816, Int'l Bhd. of Teamsters*, 853 F.2d 1046, 1054 (2d Cir. 1988); *see also Harris v.*

*Transp. Workers Union L-100*, No. 07-CV-1031 (RJD), 2007 WL 9723338, at \*4 (E.D.N.Y. Oct. 17,

2007) ("[T]he fact that plaintiff was waiting for his union to get back to him so that he could further

pursue his grievance does not toll the statute of limitations period on plaintiff's claims." (collecting

cases)).[27]  Nor does "a petitioner's pro se status and ignorance of the law . . . merit equitable tolling."

*See Townsend v. Superintendent*, No. 05-CV-4979 (JFB), 2006 WL 721517, at \*2 (E.D.N.Y. Mar. 2,

2006) (collecting cases).  Equitable tolling is applied only in "rare and exceptional circumstances," *see*

*Hosokawa*, 234 F. Supp. 3d at 443; those circumstances do not exist here.

"Where . . . a plaintiff alleging a hybrid LMRA § 301 claim has not set forth any viable

equitable reason for tolling a statute of limitations, courts in this circuit have dismissed such claims

for untimeliness."  *Doyle v. United Airlines, Inc.*, 914 F. Supp. 2d 325, 339 (E.D.N.Y. 2012) (collecting

cases).  Accordingly, Mr. Sullivan's DFR Claims and LMRA § 301 claims are untimely and dismissed

with prejudice.  *See id.*; *see also McLeod v. Verizon New York, Inc.*, 995 F. Supp. 2d 134, 143 (E.D.N.Y.

---

[26] This makes sense as a matter of policy.  As the Second Circuit has observed, "[i]nformal correspondence should not toll the statute of limitations; '[o]therwise, a plaintiff could indefinitely delay resolution of Labor disputes merely by bombarding his union with tiresome requests.'"  *Legutko*, 853 F.2d at 1054 (citations omitted).

[27] Relatedly, where "a plaintiff does not avail himself of the established grievance mechanism, but instead chooses 'to follow his own, informal approach,' non-responsiveness to a letter 'does not constitute a proper basis for tolling the statute of limitations.'"  *Cohen*, 68 F.3d at 68 (quoting *Legutko*, 853 F.2d at 1054–55); *id.* at 68 ("The inaction of the Union, while not commendable, does not permit the statute of limitations to be tolled."); *see also White*, 128 F.3d at 115; *Austin v. Gen. Motors Corp.*, No. 94-CV-832A, 1995 WL 866220, at \*8 (W.D.N.Y. Dec. 1, 1995) ("[T]he statute [of limitations in a hybrid 301 case] is not tolled where the union member fails to follow the formal appellate procedure outlined in the union's constitution.").

2014) (dismissing with prejudice Plaintiff's time-barred hybrid section 301/DFR claim); *Rosario v. Loc. 1106 Transp. Works of Am.*, 29 F. Supp. 3d 153, 160 (E.D.N.Y. 2014) (same).

## IV.     LEAVE TO AMEND

Defendants' motions to dismiss are granted without leave to amend.  "The court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint."  *Id.*  Mr. Sullivan failed to comply with the six-month statute of limitations applicable for his hybrid section 301/DFR claims; accordingly, any attempt to replead those claims would be futile.  In addition, any attempt to replead the assault claim would be futile:  even when drawing all reasonable inferences in Plaintiff's favor, Plaintiff failed to allege facts that are in any way adequate to plead a viable assault claim under New York law.  *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (noting that leave to amend need not be granted where the proposed amendment would be futile); *Rosario*, 29 F. Supp. 3d at 160 (finding that "any attempt to cure would be futile" where a plaintiff failed to comply with the statute of limitations in bringing a hybrid 301/DFR action); *Ljutovic v. 530 E. 86th St., Inc.*, No. 05 CIV. 9846 (GEL), 2006 WL 2524077, at *7 (S.D.N.Y. Aug. 31, 2006) (similar). Leave to amend is therefore denied.

## IV.     CONCLUSION

For these reasons, the Court finds that Plaintiff's claims for tortious interference, breach of the covenant of good faith and fair dealing, fraud, negligence, negligent misrepresentation, and concerted-action liability are preempted by section 301 of the LMRA.  The section 301 claims are

untimely, as is the claim alleging breach of the duty of fair representation.  And Plaintiff fails to state

a claim for assault under New York law.  Therefore, the Court grants Defendants' motions to

dismiss this case with prejudice.

      The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 86 and 90, to

enter judgment for Defendants, to close this case, and to mail a copy of this order to Plaintiff.

      SO ORDERED.

Dated:  April 25, 2024
New York, New York

                              _____
                                   GREGORY H. WOODS
                           United States District Judge